*107*

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

# UNITED STATES DISTRICT COURT
for the
### EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| Harold Persaud <br> _Petitioner_ <br><br> v. <br><br> E. Rardin (Warden) <br> _Respondent_ <br> _(name of warden or authorized person having custody of petitioner)_ | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case:2:23-cv-12374 <br> Judge: Parker, Linda V. <br> MJ: Altman, Kimberly G. <br> Filed: 09-19-2023 At 01:45 PM <br> HC PERSAUD V. RARDIN (DA) |

### PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

#### Personal Information

1.   (a) Your full name:    Harold Persaud

     (b) Other names you have used:    Harry Persaud

2.   Place of confinement:

     (a) Name of institution:    Milan Federal Correctional Institution

     (b) Address:    P.O. Box 1000, Milan, MI 48160

     (c) Your identification number:    60376-060

3.   Are you currently being held on orders by:

     ☒ Federal authorities      ☐ State authorities      ☐ Other - explain:

4.   Are you currently:

     ☐ A pretrial detainee (waiting for trial on criminal charges)

     ☒ Serving a sentence (incarceration, parole, probation, etc.) after having been convicted of a crime

     If you are currently serving a sentence, provide:

         (a) Name and location of court that sentenced you:    Northern District of Ohio
         801 Superior Ave., Cleveland, OH 44113

         (b) Docket number of criminal case:    1:14 CR 276

         (c) Date of sentencing:    January 5, 2016

     ☐ Being held on an immigration charge

     ☐ Other  _(explain)_:

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

## Decision or Action You Are Challenging

5.     What are you challenging in this petition:

☐ How your sentence is being carried out, calculated, or credited by prison or parole authorities (for example, revocation or calculation of good time credits)

☐ Pretrial detention

☐ Immigration detention

☐ Detainer

☐ The validity of your conviction or sentence as imposed (for example, sentence beyond the statutory maximum or improperly calculated under the sentencing guidelines)

☐ Disciplinary proceedings

☒ Other (explain):   Petitioner is filing an actual innocence claim. Petitioner seeks to file a successive habeas petition but cannot meet requirements of the § 2255(h) exception. Petitioner looks to the Savings Clause of 28 U.S.C. § 2255(e) for recourse. (via § 2241).

6.   Provide more information about the decision or action you are challenging:

(a) Name and location of the agency or court:   Northern District of Ohio 801 Superior Ave., Cleveland, OH 44113

(b) Docket number, case number, or opinion number:   1:14 CR 276

(c) Decision or action you are challenging (for disciplinary proceedings, specify the penalties imposed):

20 years of imprisonment. Criminal forfeiture of $93,446.25 and $250,288.42; restitution (R172 2094-95) of $2,100,000.00 and restitution of $5,486,851.03 (R 123 Page 1140)

(d) Date of the decision or action:   $1500.00 Special Assessment January 5, 2016

## Your Earlier Challenges of the Decision or Action

7.   First appeal

Did you appeal the decision, file a grievance, or seek an administrative remedy?

☒ Yes     ☐ No

(a) If "Yes," provide:

(1) Name of the authority, agency, or court:   Sixth Circuit Court of Appeals Cincinnati, Ohio

(2) Date of filing:   April 18, 2016

(3) Docket number, case number, or opinion number:   Page 6798; Fed. App. 0332N

(4) Result:   Affirmed conviction and sentence

(5) Date of result:   June 13, 2017

(6) Issues raised:   Challenged conviction and sentence forfeiture order, restitution order, and order denying release pending appeal.

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

_____

_____

_____

(b)  If you answered "No," explain why you did not appeal:  _____

_____

8.  Second appeal

After the first appeal, did you file a second appeal to a higher authority, agency, or court?

☐ Yes          ☒ No

(a)  If "Yes," provide:

    (1)  Name of the authority, agency, or court:  _____

_____

    (2)  Date of filing:  _____

    (3)  Docket number, case number, or opinion number:  _____

    (4)  Result:  _____

    (5)  Date of result:  _____

    (6)  Issues raised:  _____

_____

_____

_____

_____

_____

(b)  If you answered "No," explain why you did not file a second appeal:  _____

The Supreme Court would be next and my lawyers did not think I would get certiorari.

9.  Third appeal

After the second appeal, did you file a third appeal to a higher authority, agency, or court?

☐ Yes          ☒ No

(a)  If "Yes," provide:

    (1)  Name of the authority, agency, or court:  _____

_____

    (2)  Date of filing:  _____

    (3)  Docket number, case number, or opinion number:  _____

    (4)  Result:  _____

    (5)  Date of result:  _____

    (6)  Issues raised:  _____

_____

_____

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

(b) If you answered "No," explain why you did not file a third appeal: ___The Supreme Court__ _would be next and my lawyers did not think they would hear the case._

10. **Motion under 28 U.S.C. § 2255**

In this petition, are you challenging the validity of your conviction or sentence as imposed?

☒ Yes          ☐ No

If "Yes," answer the following:

(a)   Have you already filed a motion under 28 U.S.C. § 2255 that challenged this conviction or sentence?

☒ Yes          ☐ No

If "Yes," provide:

(1) Name of court: __Northern District of Ohio__

(2) Case number: __1:14 Cr 276__

(3) Date of filing: __June 2018 (R217 Page ID 6819-905)__

(4) Result: __Denied relief__

(5) Date of result: __November 2018 (Opinion ID 6988)__

(6) Issues raised: __Ineffective assistance of counsel__

__1 - Failure to object to expert testimony__

__2 - Failure to object to lay testimony__

__3 - Appellate counsel's failure to challenge admission of expert and lay__
      __witness testimony__

__4 - Failure to object to loss amount calculation__

(b)   Have you ever filed a motion in a United States Court of Appeals under 28 U.S.C. § 2244(b)(3)(A), seeking permission to file a second or successive Section 2255 motion to challenge this conviction or sentence?

☒ Yes          ☐ No

If "Yes," provide:

(1) Name of court: __Appellate Court of Ohio (Cincinnati)__

(2) Case number: __1:14 CR 276__

(3) Date of filing: __February 2020__

(4) Result: __60(B) Motion transferred as successive § 2255__

(5) Date of result: __Denied authorization April 14, 2020__

(6) Issues raised: __Appellate attorneys  ineffective because they did not__
__argue trial attorney's failure to inform client of details of a plea and__
__to plead guilty.__

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

_____

_____

_____

(c)     Explain why the remedy under 28 U.S.C. § 2255 is inadequate or ineffective to challenge your
        conviction or sentence:    Refer to Page 11

_____

_____

_____

_____

_____

11.    Appeals of immigration proceedings

       Does this case concern immigration proceedings?

       ☐ Yes                    ☒ No

              If "Yes," provide:

(a)    Date you were taken into immigration custody: _____

(b)    Date of the removal or reinstatement order: _____

(c)    Did you file an appeal with the Board of Immigration Appeals?

              ☐ Yes                    ☐ No

              If "Yes," provide:

              (1) Date of filing: _____

              (2) Case number: _____

              (3) Result: _____

              (4) Date of result: _____

              (5) Issues raised: _____

_____

_____

_____

(d)    Did you appeal the decision to the United States Court of Appeals?

              ☐ Yes                    ☒ No

              If "Yes," provide:

              (1) Name of court: _____

              (2) Date of filing: _____

              (3) Case number: _____

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

(4) Result: _____

(5) Date of result: _____

(6) Issues raised: _____

_____

_____

_____

_____

_____

_____

12. Other appeals

Other than the appeals you listed above, have you filed any other petition, application, or motion about the issues raised in this petition?

☒ Yes          ☐ No

If "Yes," provide:

(a) Kind of petition, motion, or application: **Five (5) Compassionate Release Motions**

(b) Name of the authority, agency, or court: **District Court, Northern District of Ohio after exhaustion with the Bureau of Prisons**

(c) Date of filing: **August 2020 - December 6, 2022**

(d) Docket number, case number, or opinion number: **R288 Page 8661**

(e) Result: **Denied compassionate release**

(f) Date of result: **Currently under appeal (Case 2023:3103)**

(g) Issues raised: **Compassionate release requested in view of Petitioner's risk of: 1 - Contracting COVID-19 (risks of diabetes, hypertension, eye disease) 2 - Sentencing disparity compared to other inmates with more serious charges 3 - Threats of violence from other inmates 4 - Ineffective assistance of counsel at trial; direct appeal and § 2255 motion**

_____

_____

_____

### Grounds for Your Challenge in This Petition

13. State every ground (reason) that supports your claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

GROUND ONE: **Ineffective assistance of trial, appellate and habeas counsel**

_____

_____

_____

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

Failure of trial counsel to communicate a plea by the government. He did not
bring experts in to testify. Did not perfect the subpoena of Debby Koblenz and
did not challenge the government witness Dr. Barry George. He did not bring up
wins in Vespoli and Collins cases. Appellate counsel failed to argue I was not
told my maximum sentence. Habeas attorney failed to argue I was not told of
the plea. These arguments were not brought up at trial.

(b) Did you present Ground One in all appeals that were available to you?

☐ Yes                    ☒ No

GROUND TWO:  Fraud; refer to section in memorandum

1. Inappropriate billing of office visits and time spent on patient visits
2. Failure to specify reasons for doing NST.

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

1. Billing can be justified by reviewing the article in Medical Economics
2. I was audited every year by all insurances and no evidence for fraud was
   ever found. Elizabeth Stois can verify.
3. All patients who had an NST done met compliance with the appropriate use
   criteria. All had heart disease or risks. The Government has the evidence in
   patients' charts. These were not brought up in court..

(b) Did you present Ground Two in all appeals that were available to you?

☐ Yes                    ☒ No

GROUND THREE:  Making false statement; refer to section in memorandum

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

The Government accuses me of obtaining a percentage blockage at catheterization,
then increasing it. (Indictment error). The higher percentage was obtained by
IVUS. This is proven by looking at the procedure note. The Government lied.
Percent at which you stent is seen in the registry and textbook. Cath lab
staff lied about "the sled." This is verified by looking at the log. These
were not argued in court.

(b) Did you present Ground Three in all appeals that were available to you?

☐ Yes                    ☒ No

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

GROUND FOUR:   Money laundering: refer to section in memorandum

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

No monies were obtained by fraud. Money placed in my wife's account was part of estate planning. Ms. Missia Vasselaney can verify.

(b) Did you present Ground Four in all appeals that were available to you?
☐ Yes                ☒ No

14.   If there are any grounds that you did not present in all appeals that were available to you, explain why you did not:   I relied on my attorneys to choose the best argument to get me relief.

### Request for Relief

15. State exactly what you want the court to do:   Reverse the conviction and a new trial. Release; return forfeiture and restitution with penalties and interest. Dismiss all charges with prejudice and vacate the judgment.

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

### Declaration Under Penalty Of Perjury

If you are incarcerated, on what date did you place this petition in the prison mail system:

8 | 31 | 23

I declare under penalty of perjury that I am the petitioner, I have read this petition or had it read to me, and the information in this petition is true and correct. I understand that a false statement of a material fact may serve as the basis for prosecution for perjury.

Date: _____8 | 31 | 23_____     _____H. Personal_____

Signature of Petitioner

_____

Signature of Attorney or other authorized person, if any

## ANSWER TO 10C

### Why 2255 is Inadequate or Ineffective

1. Because there has not been a new rule of constitutional law from the Supreme Court that makes Petitioner's conduct non-criminal, and

2. Petitioner is claiming actual innocence based on new evidence which was discovered after the one-year statute of limitations for introducing new evidence after a previous § 2255. United States v. Peterman, 249 F.3d 458 (2001, 6th Cir.). Petitioner has been diligently seeking relief since incarceration in 2016. "A valid claim of actual innocence would be enforceable under § 2241 without regards to the time limits under § 2255." Cooper v. United States, 199 F.3d 898, 901 (7th Cir. 1999). "Because serious constitutional issues would arise if a person can prove actual innocence, and who could not have placed his claim at an earlier time - had no access to judicial review, section 2241 remedy is available." Triestman v. United States, 124 F.3d 361, 363, 377 (2nd Cir. 1997).

Page 11

UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF MICHIGAN

———————————

CRIMINAL CASE # 1:14 CR 276

———————————

HAROLD PERSAUD (PRO-SE)
(PETITIONER)

V

WARDEN E. RARDIN
(RESPONDENT)

———————————

MEMORANDUM IN SUPPORT OF PETITIONER'S
WRIT OF HABEAS CORPUS UNDER THE
SAVING CLAUSE OF 28 U.S.C. § 2255(e)
VIA 28 U.S.C. § 2241. A CLAIM OF
ACTUAL INNOCENCE

———————————

## MEMORANDUM IN SUPPORT OF PETITION

Throughout my criminal case, starting in 2013 and through my investigation, indictment, trial, and imprisonment, and throughout my appeals, I, Petitioner, Harold Persaud, have maintained my innocence. I continue to maintain I did nothing wrong. I took the Hippocratic Oath at the start of my career and I live by the motto "Do no harm." My mens rea throughout was to do what I thought was best for my patients at every step, using the best practices. I continue to challenge my conviction because I don't want my patients to have any inkling that they were betrayed, and I want to clear my name. Otherwise, I could not continue to live under false pretenses. I don't want to be held under the same light as Drs. Kavorkian and Nasser.

I do admit to making mistakes for which I have no excuse, and for which I have paid a very harsh price, but the government has used such lapses in my judgment to criminalize me severely. Every busy professional makes mistakes on occasion. Even Judge Nugent, in my § 2255 opinion, confuses me with Mr. Viola. I was never given a chance to tell my story since, for reasons still unknown to me, I was not put on the stand by my attorney and due to my naivete I did not challenge him. I strongly believe but for all my attorneys' mistakes, I would not be in my current predicament. I was never informed of my right to testify.

With this motion, I have come to my final step to set matters straight, and I appeal to this Court to give this petition its most serious redress.

I have extreme pride in being a physician, especially a cardiologist, because I am called into situations where patients suffer impending doom and I am one of a few doctors privileged to work on them to save their lives. Most other doctors shy away from such situations, but I thrive and I want to be able to return to it for the benefit of all, not just the United States population. I am not yet done with my ambitions. I want my medical license back.

## Diligence

Since my incarceration, I have diligently fought for my rights to freedom. The chronological sequence of my efforts at obtaining freedom is documented in the Petition for this Habeas Motion (AO 242).

My repeated exhortations to the District Court by § 2255, § 60(b), and repeated motions for compassionate release are all denied partly because Judge Nugent thinks I am guilty and show no remorse.

There is no judicially effective manner, at this time, of putting forth an argument of failure of habeas counsel to argue ineffective assistance of appellate and trial counsels. My fourth lawyer, Mr. William Rent, attempted to do this in my § 60(b) motion, using the argument of Gonzalez v. Crosby, 545 U.S. 524, 125 S.Ct. 2641, but was denied, even at the certiorari level.

There are two ways one can view my case:

1. I am indeed guilty, refuse to take responsibility and do not deserve relief. This is supported by an indictment, trial, and being found guilty, and I am now gaming the system; or
2. I am actually innocent and a gross miscarriage of justice is taking place.

## Jurisdiction

This Court has jurisdiction in this § 2241 motion claiming actual innocence which should be filed in the district of confinement. Petitioner is being held in violation of the laws, treaties, and Constitution of the United States at Milan Federal Correctional Institution in Michigan. This matter before the District Court in Cleveland would be futile.

## Introduction

Over the 24 years that I have practiced, I preferred to be solo because I did not want to be involved in anyone else's affairs and I wanted to take individual responsibility for my actions. Over that period, I became very

efficient in my work, so I could concentrate on what was important. Like any other professional working at that level, I am able to sort the "wheat from the chaff." I am able to identify a cardiac problem, intervene upon it without incident and maintain vigilance on its progression. I was never sued for malpractice until this current situation arose, which according to the Government's own primary witness, Dr. Barry George, stemmed from a mistake by hospital staff. The Government refuses to acknowledge this fact (Exhibit 1). The Government confuses my expeditiousness with callousness and a drive to make money at anyone's expense. I maintain that I am an innocent person wrongfully convicted, but for my set of attorney's infectiveness at every level of my appeals, I remain imprisoned. It is for this reason that I am filing this motion pro-se.

Society views the conviction of an innocent person the most grevious mistake our judicial system can commit. The fundamental miscarriage of justice exception has evolved to allow habeas corpus petitioners to litigate their constitutional claims despite certain procedural bars if the petitioner can make a credible showing of actual innocence.

In Satterfield v. Da Philadelphia (US Ct. of App. 3rd Cir. Mar. 27, 2017) quoting McQuiggin v. Perkins, 133 S.Ct. 1924, 185 L.Ed. 2d 1019 (2013), it states "The McQuiggin decision allows a habeas petitioner who makes a credible showing of actual innocence to pursue his or her constitutional claims even in spite of AED PA's statute of limitations by utilizing the fundamental miscarriage of justice exception, which is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons. Underlying the miscarriage of justice exception is a sensitvity to the injustice of incarcerating an innocent person and the doctrine aims to balance the societal interests in finality, comity and conservation of judicial resources

with the individual interest in justice that arises in the extraordinary case. For that reason, in appropriate cases, the principles of comity and finality that inform the courts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration. The United States Supreme Court has underscored the importance of those principles explaining that concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected in the fundamental value determination of our society that is far worse to convict an innocent man than to let a guilty man go free."

In this motion claiming <u>actual innocence</u>, I am challenging all of the Government's accusations in the decision of the Sixth Circuit Court of Appeals on my Direct Appeal (Attached Exhibit 2) of June 13, 2017. This includes new evidence that was not presented during trial and evidence of my attorney's ineffectiveness throughout. At every step I trusted my lawyers to choose the best arguments that would give me relief, since I am not a scholar of the law. "Allegations of a pro-se habeas petition are entitled to liberal constructions and any allegations must be considered in his favor." <u>Urbina v. Thomas</u>, 270 F.3d 291 295 (6th Cir. 2001).

The Sixth Circuit has stated that "actual innocence" means factual innocence, not just legal insufficiency" <u>Souter v. Jones</u>, 395 F.3d 577, 590 (6th Cir. 2005). As long as the evidence "was not presented at trial, it may be considered "new" for purposes of showing actual innocence irrespective of whether Freeman acted with reasonable diligence in discovering it and pursuing relief." See <u>Souter</u>, 395 F.3d at 596. In <u>Souter</u>, the court expressly declined to impose temporal limitations on the sort of evidence that may be considered "new." This was reaffirmed in <u>Perkins v. McQuiggin</u>, 670 F.3d 665, 672-75 (6th Cir. Appl. Ct. May 18, 2012). "In evaluating the district court's ruling we take guidance from <u>House v. Bell</u>, 547 U.S. 518

126 S.Ct. 2064 165 L.Ed. 2d 1 (2006). "We must consider all the evidence, old and new, incriminating and exculpatory (quoting <u>Schlup</u>). Based on this total record, the Court must make a probablistic determination about what reasonable, properly instructed jurors would do. "The evidence can be exculpatory scientific evidence, credible eyewitness accounts or critical physical evidence." <u>Schlup v. Delo</u>, 513 U.S. 298 S.Ct. 851.

In view of my incarceration some of the new evidence cannot be easily retrieved. Some are in the Government's possession. Attempts to obtain such information via FOIA for this memorandum are denied. But I know where the information can be found and how they may be obtained. This is information not presented at trial. But through sworn testimony and under the penalty of perjury I attest that all the information is true to the best of my recollection. Pursuant to Federal Rules of Evidence, an evidentiary hearing may be necessary. (Rules of Evidence 404(b) and 609).

District courts are instructed to conduct an evidentiary hearing where a petitioner identifies ambiguities in the evidence that need to be resolved before reaching the merits and where a petitioner's sworn allegations indicted gaps in evidence that he or she would fill upon further discovery.

In this motion, I am not seeking relief via a successive § 2255, but I am submitting this motion claiming <u>actual innocence</u> via the "Saving Clause" of § 2255(e) via § 2241. "The Sixth Circuit has concluded that Section 2255 is an "inadequate and ineffective" remedy only if the petitioner has an actual innocence claim." <u>Bennett v. Mickey</u>, Jan. 4, 2010 (6th Cir. Dist). After evaluating this submission, you will be able to determine that no reasonable trier of fact could have found me guilty beyond a reasonable doubt. And I am suffering a gross miscarriage of justice.

In this memorandum, I am arguing four (4) grounds as follows:

<u>Ground 1</u>: Ineffective assistance of counsel at trial, direct appeal and
habeas levels.

The gist of the Government's arguments are:

<u>Ground 2</u>: Fraud (§ 1347) because of:
a. Excessive billing
b. Unnecessary nuclear stress tests (NST) (Count 1)

<u>Ground 3</u>: Making false statements (§ 1035) by placing coronary stents in
patients who did not need them and then lying about it.
(Counts 2-14).

<u>Ground 4</u>: Money laundering (§ 1957) (Count 15).

I will deal with each of these in turn and highlight what information was
not presented at trial.

A description of the common cardiac procedures can be found in the
indictment (Attached Exhibit 3) and in the Appellate Court's Opinion.

## Ground 1

### Grounds for Challenge

#### Ineffective Assistance of Trial, Appellate, and Habeas Counsel

It is widely known these days that DNA evidence can exonerate innocent
persons of their crime. In this instance, however, there is no DNA evidence.
Therefore, one has to review all the information, old and new, to determine
that viewed in total, and giving the petitioner the benefit of the doubt, no
rational trier of fact would have found me guilty beyond a reasonable doubt.

I am providing new evidence, not presented at trial which, due to my
diligence, I have encountered after the statute of limitations for a § 2255
had expired. The constitutional infraction that enables this motion under §
2241, claiming actual innocence, is the ineffective assistance of counsel, my
Sisxth Amendment right, and the newly discovered evidence.

I am well aware of the Court's desire for finality and to conserve
resources but our Constitution holds a person's freedom in pre-eminence.
Additionally, the Ends of Justice Doctrine determines that this Court should

hear this case with a view towards exculptation.

It took my fourth lawyer, Mr. William Kent, to find out that my trial lawyer, Mr. Henry Hilow, never informed me of a plea by the Government even though one was on the table (Exhibit 4). There was no information about a plea given to me until the start of trial. I had no plea discussions with Mr. Hilow, no information of the sentence variation and no information on the strength of the Government's case. In fact, Mr. Hilow and his partner, Mr. William McGinty, assured me of a win in my case. Under <u>Missouri v. Frye</u>, 132 S.Ct. 1399 182 L.Ed. 2d 379 (2012) "Defense counsel has a duty to communicate formal plea offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."

I was also not informed by the Court, the prosecutor or my trial attorney that I could get a life sentence. If I was informed of this plea and knew I could get a life sentence, I would have taken a plea of 87 months. Anyone faced with a life sentence would have taken the plea or I would have taken an Alford plea.

The Sixth Circuit has described the obligations of defense counsel as it relates to advice during plea negotiations as follows:

> "A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary to secure a conviction and discuss the sentencing exposure." <u>Moss v. United States</u>, 323 F.3d 445, 474 (6th Cir. 2003) Holding that failure of defense counsel to provide professional guidance regarding a defendant's sentencing exposure constitutes deficient performance.

After sentencing, Mr. Hilow said in the presence of my family, "I didn't think you could get 20 years."

I have now completed the 87 months that the Government wanted in their plea. With all the exculpatory evidence provided in this motion, this Court will be able to determine that I am not guilty. But for my attorney's ineffectiveness at every stage, the full story has not yet been told. It

behooves this Court to grant immediate release from custody and expunge the criminality of the case. Anything else will be view as "cruel and unusual punishment."

My fourth lawyer argued this lack of plea information as a mistake by my habeas attorneys in a 60(b) motion but that was denied and construed as a successive § 2255 motion. The Appellate Court denied a certificate of appealability. So that argument (about the plea) has not been considered by the Courts.

## Ineffective Assistance of Trial Counsel

The following shows further evidence of my trial attorney's failures:

His most serious errors were not to challenge Dr. Barry George, Chief Government witness. When Dr. George said "The whole case was based on a mistake by the technicians" and that "the technicians were not recording (the IVUs) when they should be recording." That was the whole gist of the case that started the ball rolling that led to my conviction. (Exhibit 5).

If my trial attorney, Mr. Henry Hilow, had continued this line of questioning, the jury would have discovered that the hospital and its staff had made serious mistakes in patient management leading to an indictment based on inaccurate and incomplete information. This would represent credible eyewitness account. Dr. George can be subpoenaed to appear in court at an evidentiary hearing to further clarify this statement and to verify no fraudulent intent.

Mr. Hilow also failed to perfect the subpoena of Nurse/Technician Ms. Debbie Koblenz (approx. spelling) to testify, which also would have exonerated me. I asked Ms. Koblenz prior to trial, if all the blockages that I stented were 60% or greater to which she unhesitantly replied "Yes."

Mr. Hilow did not interview Government witnesses before trial. The witness statements were given to him by the Government on the morning the witness

(8)

testified.

He also did not have experts testify on my behalf. Even the Appellate Court in their opinion on my direct appeal (<u>USA v. Persaud</u>, June 13, 2017 (6th Cir. App. Ct)) mentions "The Government presented a wealth of <u>uncontested</u> evidence."

## Ineffective Assistance of Appellate Counsel

The Chandra Group, who wrote my direct appeal, used the weakest argument they could make; that the evidence was insufficient to convict. If they had diligently read my PSR, they would have discovered that I was never informed by the Court of my potential maximum sentence which was life. This was only discovered by my fourth attorney, Mr. William Kent (Exhibit 6). This was a violation of Federal Rules of Criminal Procedure, Rule 11, and my constitutional right to due process. This argument more likely would have obtained me relief. It is important to be informed of the maximum sentence. It helps an accused to decide if he should take the plea or not.

## Ineffective Assistance of Habeas Counsel

The Lillie and Holderman Group wrote my § 2255 motion arguing <u>Daubert</u> arguments, instead of arguing that my trial lawyer was ineffective for the reasons mentioned above and also not informing me of the details of a plea. In fact, my trial lawyer, Mr. Henry Hilow, lied that there was no plea by the Government. Again, this was discovered by Mr. Kent. I had informed Messrs-Lillie and Holderman of the lack of plea disclosure (Exhibit 7). Ms. Holderman, in a letter written on my behalf to the pardon attorney, admits to this mistake (Exhibit 8).

For these reasons, I am hesitant to having another attorney write this motion for actual innocence and I am proceeding pro se.

I have not had an unobstructed procedural shot at presenting this claim.

## Ground 2

### Count 1. Fraud by Excessive Billing and Unnecessary Nuclear Stress Tests

I practiced cardiology only, as opposed to some cardiologists who also practice internal medicine, and I pride myself in being able to perform clinical, non-evasive, invasive and nuclear cardiology. This enabled me to manage, essentially, all of the patients' cardiac problems. In my view, it is better for the patient if one person can treat all the patients' problems rather than a divided group of specialists each focusing on their own subspecialty. It leads to better patient care. I deliberately trained in all areas of cardiology because it was my profession; I wanted to be the best at it and wanted to learn everything about it.

### Excessive Billing

The Government accuses me of "overtesting, overtreating and overbilling and I cut corners to increase my patient load." According to them, this represented deliberate fraud.

In testing my patients, I followed what was usual practice and nothing extraordinary. All my patients had serious heart disease or some cardiac symptom(s) or risks for heart disease. It is usual to see such patients on a 3 to 4 or 6 monthly basis.

Some patients require only ten (10) minutes for their visit and some require 25. As patient, Mr. Greg Glen, said during testimony, "I spent 25 minutes on average with him." This is not unusual.

Indeed, at one location, I did see patients for 10-15 minutes and wrote 25 minutes in the chart. That was because the patients' full time with my does not start or end during that 10-15 minute session. Before the patient comes to the office, I have to review their last cardiac catheterization or intervention films at the hospital; not every patient and not every time.

Following their visit, I have to perform other functions for them, such as:

1. Follow up blood test results, multiple times before their next visit, which come in about two (2) weeks later. Then I have to evaluate it, act upon it, call the patient with instructions, change dosages, ect.

2. After the visit, I frequently call the referring doctor, review cardiac rehab reports, read consultation reports, call patients' families since most are older, schedule additional tests and then call the patient with instructions. Then recall the hospital for a date and time, etc.

All these events take up professional time. You cannot bill, as far as I am aware, for these extra procedures done on a different day, so I add the extra time to their office visit. Besides, in the latest CPT Codebook, time is not a factor in billing, only the complexity of the case. **I was not given the opportunity to explain this at trial.** Other doctors do the same.

## Billing Level 5

As the Government mentions, I did indeed bill a Level 5 (the most complex) most of the time. That was because the CPT Code for a Level 5 visit's requirements were recently changed. I had read the changes in an article published recently in Medical Economics and I thought I was following the guidelines precisely.

For a Level 5 billing (99215) you have to have two of three things:

1. A complex history
2. A complex, detailed examination
3. A complex plan of management.

I give myself 2.5 out of 3; which would indicate a Level 5. I don't always do a detailed examination, only that pertinent to the cardiovascular system. Most of my patients are older with many diagnoses including non-cardiac conditions which you have to keep in mind. The decision making process can be very complex and involve risks to the patient, and in the extreme, cause death. That is why I bill Level 5. **This was not explained at trial.** You can also be penalized for underbilling. My staff cannot do the

(11)

billing since they are not trained in medical diagnosis. This justification
for Level 5 billing can be obtained by persuing the article published in
Medical Economics. "Inappropriate Billing By 1 Level Is Not Indicative of
Fraud, But an Educational Issue." (Ms. Chris Miller, Billing Expert, Page
4079, Line 5). **This article was not produced at trial.**

Furthermore, all the major insurance companies audited me, as they do
every doctor, every year, looking for evidence of fraud or overperformance.
If I was overpaid, based on their review, I occasionally had to write a check
for reimbursement. However, I was never flagged for fraud or overperformance.
I was completely compliant. This can be attested to by my Office Manager, Ms.
Elizabeth Stois. Ms. Stois dealt with the insurance companies on my behalf.
This would represent credible eyewitness or factual evidence. She can also
testify that the staff secured the patients' charts at locations that I was
not aware of and can counter the Government's charge of obstruction of
justice. Ms. stois is now working for University Hospitals of Cleveland, which
started the whole scenario. Attempts to obtain an affidavit from her were
unsuccessful. But she can be subpoenaed to appear for an evidentiary hearing.
This counters the Government's accusations of overtreating and overbilling.

## Unnecessary Nuclear Stress Tests (NST)

Prior to my indictment, there was the realization that the use of NST
was being abused and was being done by family doctors for profit. However,
my specialty of cardiology requires some form of testing to see if a patient's
heart disease is progressing. Some cardiologists use CT angiograms, some use
stress echocardiography. I prefer NST because I am trained in it, I understand
it, and I obtain pictures of the patient's coronary bloodflow which I can keep
for future reference.

Indeed, I brought patients over to my adjoining office on occasion (a

total of 3 or 4 in a 6-year period) for NSTs to be done. That modality benefits all four sets of actors and is not unusual. It benefits the patient most. It was only done for patients who the insurance company would allow 23 hours of observation. The insurance company benefits from getting the patient out within 24 hours at a lower cost to them. The patient benefits because they get to return home quickly with an expedited evaluation and return to employment. The hospital benefits by having another bed available for another patient and yes, I benefit from a small profit. But most importantly, I get to keep the NST pictures in my patient's chart for future reference. This is especially important during a future visit to the emergency room in which case I don't have to hunt down the NST pictures because I know where they are. It makes for better patient care. **This was not explained at trial.**

## Making Up Diagnoses

As opposed to what the Government says, I did not make up additional diagnoses to enable me to perform NST or any test. What the Government is referring to is the fact that for every patient over the six (6) years that they accused me of criminality, I did use the same set of diagnoses (chest pain, possible angina, abnormal EKG, arrythmia, CAD, dyspnea) (Exhibit 9). But that was a mistake. Not every single patient over the six (6) years (3,000 patients) had the same identical diagnoses. My mistake was that I did not specify which diagnosis was pertinent for which patient. All the patients, however, had heart disease or risks for it. Exhibit 9 shows a sample of my NST report with the error, which was unintentional. Note that this random patient, with an abnormal NST had no further procedures but was continued on medications. **This was not defended at trial.**

The necessity for annual NST can be determined by looking at the appropriate use criteria (AUC) set by our peers in nuclear cardiology and all

my patients conformed to it. The patients' need for annual NST can be
determined by looking at their charts for th qualifying diagnoses. Attempts to
obtain information for my appeals via FOIA have been denied (Exhibit 10). This
is a prima facie showing of suppression of evidence.

Annual NST in certain patients is an established method of determining
progression of coronary disease. Qualification for NST include: Annually
five (5) years after coronary bypass surgery or annually after two (2) years
of insterting a coronary stent; or multiple risk factors for heart disease.
The patients chosen by the Government conformed to these criteria. This was
confirmed by the Chandra Group in my direct appeal (June 2018 R 217 Page ID
6819-6905)(Exhibit 11). **This was not explained at trial.** Furthermore, if a
patient complained of a certain symptom, say chest pain, even many years
before, you can still use that diagnosis when billing currently. It is called
a historic diagnosis and can be used in billing office visits or NST. This
was mentioned by billing expert, Ms. Chris Miller (Page 4206 Line 18) at trial
and is documented in the International Classification of Diseases (1 CD - 9).
Therefore, there was no false billing. Opposing the Goverment's accusations
and patients were not overtested.

**Doing NST on Family Members**

I did indeed ask some patients' families (those that I was close to,
and only on three (3) occasions) if they wanted me to test them. That was
because some patients came to the office with family members frequently until
the day the family member did not show up. Further questioning disclosed that
the family member had died suddenly from heart disease, which made me very
upset. If they had only said something I could have saved them. I was irate
and then started asking family members who were at risk if they wanted to be
tested, because the equipment was available. The proof of the patients'

(14)

qualifications for NST can be found by examining the patients' charts (in p½ossession of the Government). **This was not mentioned at trial.**

## Doing Two (2)-Minute Stages in NST

Next, the Government accuses me of cutting corners in doing 2-minute stages in my NST as opposed to three (3) minutes. What the Government does not realize is that there are many different protocols for doing a stress test or a cardiologist can even make up his own protocol. Doing 2-minute stages does not negate the value or diagnostic accuracy of the test. I used the treadmill to get the patients' heart rate up to a certain level, or as far as the patient could manage. Even with a sub-optimal level of exercise, the injected nuclear agent was able to produce clear, detailed images of cardiac blood flow. That is partially why I preferred NST as opposed to another modality. Most of the time I took blood pressures before and after stress; but admittedly, not always. My major concern was patient safety and I did not want to increase their burden with a sphygmomanometer around their body.

## Not Doing Chemical Stress Tests

Again, because of my concern for patient safety, I did not like to perform chemical stress tests. I had seen cases where the injected agent (Adenosine or Persantin) caused patients to go into recurrent dangerous heart rhythms (ventricular tachycardia) requiring recurrent defibrillation. I encouraged my patients to work on the treadmill, which is more physiological; and they could take solace from the fact that I stayed beside them.

For this reason also, I did not hire a second nuclear technician, at a significant cost, when I could do the job as well or better. I am very proficient at inserting IVs and in the case of an adverse cardiac event, I am better prepared, in level of knowledge both about the patient and in heart disease, to manage such a situation. The patient remains at ease with a

(15)

knowing and familiar face.

**I did not get the opportunity to say any of this at trial.**

## Using the Cheapest Isotopes

Finally, the Government accuses me of using the cheapest isotopes during NST. The decision to use a particular isotope was done mutually between myself and Digirad, the company I hired to assist me in NST. The decision was based on obtaining good images in an efficacious manner; and if you can get the same quality with a less costly agent it is only common sense to use it. I relied on Digirad to guide me on the use of the different isotopes as I am not educated enough to determine which were the best ones to use. Frequently, a combination of isotopes were used as in the example of Exhibit 9. However, no matter what isotopes were used the price is fully refundable by the insurance company. So it is essentially a non-issue. **This was not mentioned at trial.**

It would have been straightforward to have one of the doctors from Digirad (Dr. MIssoulla or Dr. Jaros) who regularly overread my studies looking for fraud, accuracy and excessive use to give testimony at trial, which was not done. The doctors can be subpoenaed to appear at an evidentiary hearing. My lawyer failed to act on this important issue which was the cause of my biggest financial loss. This is in line with what the Appellate Court mentions about lack of experts. Ms. Stois can also verify that Digirad doctors audited my NST on a regular basis.

## Embellishing Patients' Notes

The Government also accused me of embellishing patients' office notes. This is absolutely untrue. I did indeed rewrite notes when insurance companies wanted my office to fax the progress notes for certain patient visits to check for fraud and compliance. Very often, they could not understand my penmanship,

(16)

so they would make calls to me at my office to clarify what I wrote which would interrupt the patient encounter. To preemptively avoid this, and to be efficient, I rewrote the notes to make them more legible. **This was not clarified at trial.**

### Ground 3

### Counts 2-14. Inappropriate Placement of Coronary Stents
#### (False Statements)

The Government's argument that I placed stents in patients' coronary arteries unnecessarily originated from hospital staff. Chief Cath Lab Nurse Cathy Parsh reported to the new, inexperienced Head of Cardiology Dr. John Coletta that she thought the intravascular ultrasound (IVUS) that I did on patients did not indicate a serious blockage. But she is not trained in reading IVUs. Dr. Coletta then reviewed the films, but he is not experienced in IVUs and was shown to not be able to discern the inside of the catheter versus coronary plaque. Based on what I saw on patients' RE's IVUs, I asked for a surgical opinion, not heart surgery. A surgeon will not operate on my opinion, but will review the patients' information and test results, and he determines if surgery if appropriate. He makes the decision, not me. And he wouldn't do that without reviewing the evidence.

Because I was suspicious of Dr. Coletta's ability to read IVUs, I showed him an IVUs picture of a patient (not RE) and asked his interpretation. I showed the same IVUs picture to three (3) other experienced cardiologists at another hospital, Dr. Trilok Sharma, Dr. Sabino Velloze and Dr. Khatri. They all agreed, and signed, with my interpretation and against Dr. Coletta's reading. This incorrect reading was evidence by Dr. Adnan Mourany, the President of the Medical Staff, in a presentation I gave in the summer of 2012 to the Department Heads of St. John Hospital. **This was not brought up at**

(17)

trial. This can be verified by looking at the minutes of that meeting or by subpoenaing Dr. Mourany.

As Dr. Barry George, Chief Government witness, said during his testimony, "The whole case was based on a mistake" and that the "technicians were not recording (the IVUs) when they were supposed to be recording." Ms. Parsh was not even aware that her staff were not performing their duties. The Cath Lab staff then lied during trial (perjury) when they mentioned that I used "The Sled" during my IVUs. This is totally untrue. I never use the Sled. Nurse Cathy Parsh said at testimony "I'm sure he uses the Sled" (Page 76, Line 11) and Nurse Joni Mimalik said "He uses the Sled" (Page 1433, Line 10). The importance of the sled is if I used it I would be responsible for recording the images. Obviously then, they were trying to deflect the blame for their lack of recording to me. Whether I used the Sled or not is easily found by looking at the log of the procedure done on that patient on that day. All equipment used during a cardiac procedure are documented in the log. The Government is in possession of those records. **The log was not produced at trial.**

Dr. Coletta then went on to review more of my cases, with the same inability and concluded many of the stents were not needed. But, how can he come to that conclusion when he doesn't have the information, and, if he does, doesn't know how to read it? Compounding this false accusation is Dr. Barry George's report on a batch of my stent cases, his conclusion was that the stents were not needed. Yet, he knew the technicians were not recording, and the information was deficient. Evaluation of my other cases by Dr. Miram Bezerra brought the same conclusion. Note that all these players, Dr. John Coletta, Dr. Barry George and Dr. Miram Bezerra were all paid or employed by University Hospitals of Cleveland, joint owner of St. John Hospital in West Lake, where this scenario occurred. Dr. George can be subpoenaed to appear

at an evidentiary hearing.

Based on the inaccurate report, the Hospital Chief Medical Officer of St. John Hospital in West Lake, Ohio (CMO), Dr. Michael Dobrovich, sent letters to my stent patients informing them that they "had a stent placed in their hearts that they thought were not necessary." They did this despite me informing them of the lack of recorded information in a letter to "The Independent Reviewer" dated June 4, 2012 (Exhibit 12). As a result, 16 lawsuits were filed against me and my malpractice insurance soared from $14,000 a year to $400,000 a year.

Of the 16 lawsuits, two went to trial and I prevailed on both (Vespoli v. Persaud and Collins v. Persaud). Both cases showed Dr. Coletta's misinterpretation of IVUs and both showed severe blockages (over 60%), after realizing they had made a major error, the hospital capitulated and sent a second letter to patients indicating "they may not have had all the information." As a result, ten more lawsuits were dropped. This sequence of events are documented in a complaint to the Civil Court in Cleveland by my lawyer Mr. Richard Haber (Exhibit 13). **This was not brought up at trial.**

Between the two letters, Dr. Dobrovich had informed the local press, the Cleveland Plain Dealer, and informed the Government. Consequently, the FBI raided my office and proceeded to build a case against me, despite them knowing the information was deficient. Dr. Dobrovich was soon terminated from St. John Hospital.

## False Statements About Percentage Blockage

In Counts 2 to 14 of the indictment, the Government's pervasive theme is that I obtained a percentage blockage at cardiac catheterization and then deliberately increased it (Exhibit 3 supra) to justify inserting a stent and make money. But what is missing in the indictment is the fact that I obtained the higher percentage blockage by IVUs, a more sensitive test. The indictment is therefore fraught with errors. This can be verified by looking at the

procedure report for that patient. It will clearly say that the lower percentage blockage was obtained by cardiac catheterization and IVUs was used to clarify the situtation. This was not clarified at trial. All patients had a prior NST indicating a blockage of 60% or greater, since NST only becomes abnormal when the blockage is 60% or greater. IVUs was done to clarify this discrepancy between an abnormal NST (indicating a 60% or worse blockage) and cardiac catheterization which shows a lesser degree of blockage. Further, there are no hard and fast rules in using IVUs; it is a tool like any other used to help the doctor and his patient. This was not mentioned at trial. Attempts to obtained these reports which the Government has, via the FOIA, have been denied.

Furthermore, Nurse/Tech, Ms. Debbie Koblenz, who assisted me in most of my stent procedures, can verify that all the blockages were at least 60% in severity. Ms. Koblenz did not honor her duty to testify even though she was subpoenaed to do so and my trial lawyer failed to perfect her subpoena.

These arguments support my contention that I did not make false statements regarding health care matters and that the indictment was erroneous or fraudulent.

## Stenting at Less Than 70% Stenosis (Blockage)

Yet the Government insists you only stent when a stenosis is 70% or worse, nowhere is that written in the cardiology literature. In fact, the Textbook of Interventional Cardiology written by Dr. Eric Topol, formerly of the Cleveland Clinic, mentions that 65% is the number at which you stent. This can be produced for an evidentiary hearing and was not mentioned at trial. I followed this guideline but may vary by 5% which is allowed.

The Registry of Stenting kept on record indicates that in 2011, one of the years the Government included in their investigation, 13% of 1.1 million stents were inserted for blockages between 40 and 70% (Exhibit 14). Some

patients had no symptoms. Are all these 130,000 patients, cases of fraud?
This is scientific factual evidence of no wrongdoing. It goes to prove that
my stenting was in line with what other cardiologists did. This report was
not brought up at trial and will absolve my stenting practice.

<u>Stenting Regions Away from the NST Abnormality</u>

The Government then states that I stented in regions of the heart when the
NST indicated that the blockage was in a different region. That is totally
true. But that still poses a danger to the patient. It still puts him at
risk for sudden death. Dr. Caccione, Government witness, said at trial that
two thirds (2/3) of all heart attacks (which causes death) occur when the
blockage is 50% or less (Page 1314, Line 8). Just because it is inconveniently
where you don't expect it do you leave it alone. The patients are not aware
of the potential danger; I am. And I will do my best to protect my patient.
This was not explained at trial.

The jury was also not informed that a coronary artery can have severe
blockage(s) throughout, yet the angiograms can appear normal. Sometimes IVUs
is done in those situations to see if the artery is diseased or is, in fact,
normal.

<u>Doing Additional Invasive Tests</u>

Lastly, the Government informs the jury that I did additional tests, such
as renal (kidney) angiograms and aortograms to make money. Other cardiologists
do the same for the benefit of the patient. It is done because athersclerosis
is a generalized disease which can affect the aorta (leading to dangerous
aneurysms) and renal arteries (leading to severe hypertension). It takes no
longer than 2-3 minutes to check for those, and all you need is an outline
of the vessel. I have found evidence for both that led to benefits for the

(21)

patient. Again, **the** jury was not so informed.

## Ground 4

### Count 15. Money Laundering

Monies were indeed transferred from my business account to my wife's personal account. This was done regularly as part of our estate planning and upon the advice of our estate planners, the latest being Ms. Missia Vasselaney. Our assets had been divided up equally between us. The fact that a transfer occurred on a day of our investigation is purely coincidental. Since none of these monies were derived from fraud, or fraudulent intent, there was no money laundering. Ms. Vasselaney can attest to this. **I did not get to clarify this at trial.**

## Conclusion

The United States Supreme Court has held that "If a habeas petitioner presents evidence of innocence that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the underlying merits of his claim." Schlup, 513 at 316. Thus, the threshold is "whether new facts raise sufficient doubt of petitioner's guilt to undermine confidence in the result at trial."

The evidence presented here, together with non-harmless constitutional error of ineffective assistance of counsel at all levels should make this Court realize that no reasonable juror would have found me guilty beyond a reasonable doubt. My conviction should be reversed and I should be immediately released from custody since I am suffering a gross miscarriage of justice. The judgment should be vacated and charges dismissed. All assets taken by forfeiture and restitution should be repaid with penalties and interest paid by the United States Government. In the alternative, an evidentiary hearing

is required. For the sake of justice, I would like my name back.

Respectfully Submitted,

Signed: Harold Persaud (60376-060)

## ATTESTATION

Under the penalty of perjury, I swear the above to be true and accurate to the best of my memory.

Signed: Harold Persaud (60376-060)

EXHIBIT 1

clearly revealed. (Ex.RWB2, App'x 1847; Ex.MH5, Suppl. App'x 1961.)

The procedure was warranted despite the government's hyperbolic characterization of MH's conversation with Dr. Persaud, in which she simply wished to know the *worst* that could happen should she decline to undergo the test. (R.189, Tr., MH, PageID4601.) The government says that "Persaud told MH that if MH did not have the procedure MH would 'have a heart attack and die'"—undoubtedly a tendentious recasting of a conversation typical of those that occur regularly between patients and doctors who are ethically and legally obliged to explain the risks of proceeding (or not proceeding) with a contemplated course of treatment. Given MH's undeniably serious risk factors, Dr. Persaud's answer was correct. The fact that MH was nervous and may have "broken out in hives" upon learning that she needed a cath is irrelevant to whether she in fact needed one. Such news, of course, could make anyone nervous.

## VI.    The reviewers' criticisms of Dr. Persaud's use and interpretation of IVUS were inconsistent and inadequate to prove intent.

The government recounts the events leading up to its investigation of Dr. Persaud, including the case—RE—that initially aroused suspicion. Br. at 29 ff. Despite providing a detailed discussion of Dr. Barry George's review of an initial batch of 65 cases, however, the government neglects to discuss

EXHIBIT 1

George's most crucial testimony—that the entire investigation could well have been based on a mistake.

As discussed at length in Dr. Persaud's opening Brief, George conceded that "Dr. Persaud may have a point in his letter regarding the technical inefficiency, equipment malfunction or poor recordings." (R.186, Tr., Page ID#3706.) "[I]f there were technical issues," Dr. George also acknowledged, "it was the technician not recording when they were supposed to be recording." (*Id.* at PageID#3708.) Despite this pivotal testimony, however, the government's Brief does not so much as mention the issue. (Reviewers regardless lacked sufficient materials to second-guess Dr. Persaud, since few hospitals actually *store* full IVUS runs. (R.194, Tr., Magorien, PageID#6177).)

Despite his admitted lack of interpretable materials, George claims that Dr. Persaud misinterpreted IVUS in "every single case" of the first batch of 30 patients he reviewed. (R.186, Tr., George, PageID#3706.) But this should come as no surprise, since Coletta had given him his own set of hand-selected cases that, for him, "specifically raised concerns." George's evaluation, moreover, was unavoidably tainted by Coletta's own impressions. (R.186, Tr., George, PageID#3741.)

EXHIBIT 2

---

**UNITED STATES OF AMERICA, Plaintiff-Appellee, v. HAROLD PERSAUD, Defendant-Appellant.**
**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**
**2017 U.S. App. LEXIS 10659; 2017 FED App. 0332N (6th Cir.)**
**17a0332n.06Nos. 16-3105; 16-3427; 16-3578**
**June 13, 2017, Filed**

---

**Notice:**

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.**

**Editorial Information: Prior History**

{2017 U.S. App. LEXIS 1}ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.United States v. Persaud, 2016 U.S. Dist. LEXIS 51644 (N.D. Ohio, Apr. 18, 2016)

**Counsel**                     For UNITED STATES OF AMERICA (16-3105, 16-3427, 16-3578), Plaintiff - Appellee: Michael L. Collyer, Assistant U.S. Attorney, Chelsea S. Rice, Assistant U.S. Attorney, Office of the U.S. Attorney, Cleveland, OH.
                              For HAROLD PERSAUD (#60376-060, 16-3105, 16-3427, 16-3578), Defendant - Appellant: Subodh Chandra, Sandhya Gupta, Donald P. Screen, Law Office, Cleveland, OH.

**Judges:** BEFORE: BOGGS, McKEAGUE, and GRIFFIN, Circuit Judges.

**CASE SUMMARY**Because the jury could rely upon admitted expert testimony in determining defendant's guilt, defendant failed to meet his burden of demonstrating that his convictions for health-care fraud, making false statements relating to health-care matters, and money laundering under 18 U.S.C.S. §§ 1347, 1035, 1957, were not supported by sufficient evidence.

**OVERVIEW:** HOLDINGS: [1]-Because the jury could rely upon admitted expert testimony in determining defendant's guilt, defendant failed to meet his burden of demonstrating that his convictions for health-care fraud, making false statements relating to health-care matters, and money laundering under 18 U.S.C.S. §§ 1347, 1035, 1957, were not supported by sufficient evidence; [2]-Because issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, were deemed waived, defendant forfeited any argument pertaining to his sentence or the district court's restitution and forfeiture orders.

**OUTCOME:** Judgment affirmed. Government's motion to strike dismissed as moot.

A06CASES                                    1

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*EXHIBIT 2*

**LexisNexis Headnotes**

***Criminal Law & Procedure > Appeals > Standards of Review > De Novo Review > Sufficiency of Evidence to Convict***

An appellant challenging his conviction on sufficiency-of-the-evidence grounds faces a high bar, defendant's conviction must be upheld if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Consequently, the appellate court will reverse a judgment for insufficiency of the evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence.

***Criminal Law & Procedure > Criminal Offenses > Fraud > Fraud Against the Government > False Claims > Elements***

To commit health-care fraud, one must knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program or fraudulently obtain any of the money or property owned by, or under the custody or control of, any health care benefit program in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C.S. § 1347. A conviction under this statute requires that the government prove beyond a reasonable doubt that the defendant (1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud. Proving fraudulent intent does not require direct evidence. Rather, a jury may consider circumstantial evidence and infer intent from evidence of efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits.

***Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Credibility of Witnesses***

The reliability and believability of expert testimony, once that testimony has been properly admitted, is exclusively for the jury to decide. The court has long held the view that the weight and credibility of the testimony of a party's expert witnesses were for the jury.

***Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Credibility of Witnesses***

It is for the jury to weigh the evidence, to determine the credibility of expert witnesses and to cull the truth out of these seeming contradictions.

***Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Credibility of Witnesses***

The weight given to lay and expert testimony and the credibility of such witnesses is for the jury to determine.

***Criminal Law & Procedure > Appeals > Standards of Review > De Novo Review > Sufficiency of Evidence to Convict***

The appellate court's task on review is to determine whether any rational trier of fact, viewing the evidence presented at trial in its entirety, could find the defendant guilty beyond a reasonable doubt of all of the elements of the crime for which he was convicted. It cannot be the case that a juror acts irrationally as a matter of law when he credits the testimony of one expert witness over another.

A06CASES                                          2

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*EXHIBIT 2*

*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Requirements*

The appellate court will not reverse on grounds not raised in the trial court.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Fraud Against the Government > False Statements > Elements*

18 U.S.C.S. § 1035 forbids the making of any materially false, fictitious, or fraudulent statements or representations in connection with the delivery of or payment for health care benefits, items, or services. To establish guilt, the government must prove that the defendant made these false statements knowingly and willfully.

*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Money Laundering > Elements*

Money-laundering is governed by 18 U.S.C.S. § 1957. In order to be found guilty of money laundering, a defendant must (1) knowingly engage, or attempt to engage in a monetary transaction, (2) know that the funds involved in the transaction are criminally derived, (3) use criminally derived funds in excess of $10,000 in the transaction, and (4) use funds derived from specified unlawful activity.

*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Requirements*

It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.

*Criminal Law & Procedure > Appeals > Reviewability > Waiver > Waiver Triggers Generally*

Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.

### Opinion

**Opinion by:**     BOGGS

### Opinion

BOGGS, Circuit Judge. On August 20, 2014, defendant-appellant Harold Persaud, M.D. was named in a 16-count federal grand jury indictment in the Northern District of Ohio. He was charged with one count of health-care fraud, in violation of 18 U.S.C. § 1347, fourteen counts of making false statements relating to health-care matters, in violation of 18 U.S.C. § 1035, and one count of money laundering, in violation of 18 U.S.C. § 1957. The grand jury also returned a forfeiture finding, requiring Persaud to forfeit any and all property linked to the charges, including $343,634.671 seized from two bank accounts associated with Persaud and his wife.

The thrust of the government's charges was that Dr. Persaud, a cardiologist working **{2017 U.S. App. LEXIS 2}** in his own private practice in Westlake, Ohio, ordered unnecessary tests and systematically overestimated the degree of arterial blockage in his patients in order to justify costly interventional procedures such as "stenting."2 The government also accused Persaud of "upcoding" certain medical bills-that is, Persaud intentionally overreported the complexity of his patients'

A06CASES                                   3

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT 2

medical issues in order to maximize his reimbursement from Medicare and private insurers.

Persaud pleaded not guilty. In a nearly one-month jury trial, lasting from August 31, 2015, to September 28, 2015, the government presented 34 witnesses, including 11 physicians, eight patients, and four nurses. The defense relied on five witnesses, including an expert cardiologist, two referring physicians, and a coding expert. The jury ultimately convicted Persaud on all charges, except for one of the false-statement counts listed in the indictment. In a subsequent money-judgment hearing, the same jury returned special verdicts concluding that: (1) the $343,634.67 seized from the Persauds' bank accounts was forfeitable proceeds of Persaud's health-care fraud scheme; (2) the $250,188.42 seized from Persaud's wife's account was{2017 U.S. App. LEXIS 3} related to his money-laundering conviction; and (3) Persaud's scheme generated gross proceeds in the amount of $2,100,000.

The district court sentenced Persaud to 20 years of imprisonment, a $1,500 special assessment, and restitution. The district court later determined the outstanding restitution amount to be $5,486,857.03.3 which consists of money damages to be paid to Persaud's patients, their private insurers, and the United States. Persaud filed separate appeals challenging his conviction and sentence, the forfeiture order, the restitution order, and the district court's order denying release pending the outcome of this appeal. The first three challenges have been consolidated in this appeal; another panel has already denied Persaud's request for release. The government has also filed a motion to strike portions of Persaud's briefs on appeal, arguing that they impermissibly relied upon evidence that was not admitted at trial.

For the following reasons, we affirm Persaud's convictions on all counts, his sentence, and the district court's restitution and forfeiture orders, and we dismiss the government's motion as moot.

I

A

Persaud's medical practice focused on the treatment of coronary{2017 U.S. App. LEXIS 4} artery disease ("CAD"). CAD involves the narrowing or blockage of the coronary arteries and is usually caused by age and the accumulation of cholesterol and fatty deposits on artery walls. When the narrowing of the artery becomes significant, it may begin to cause heart problems. The American College of Cardiology defines significant CAD as an artery where the blockage (referred to as stenosis) exceeds 70% of the artery's diameter. In the case of the left main coronary artery, however, the stenosis threshold for significant CAD is 50%. Although the definition of CAD incorporates these stenosis thresholds, another key determining factor in any CAD diagnosis is the patient's symptoms. Only when a patient reports symptoms of heart disease *and* stenosis levels above safe thresholds is a CAD diagnosis appropriate.

Properly diagnosing a patient's CAD can involve a variety of tests, each with advantages and disadvantages. Electrocardiograms ("EKG") and echocardiograms ("ECHO") are relatively low-risk tests that use electric signals and ultrasound waves to give the diagnosing doctor an idea of the patient's heart rate and chamber integrity. Nuclear Stress Tests ("NST") involve injecting a patient{2017 U.S. App. LEXIS 5} with a radioactive material, subjecting the patient to cardiovascular exercise, and then observing the blood flow through the heart while under stress and at rest. Because this procedure involves injecting the patient with radioactive materials and strenuous exercise, NSTs put a patient at a greater risk of harm than an EKG or an ECHO.

If these tests reveal that the heart is receiving insufficient blood flow and a patient is reporting symptoms of heart disease, then additional invasive imaging procedures may be prescribed to determine whether a patient is experiencing arterial stenosis. These tests also involve risks and

A06CASES                                                    4

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*EXHIBIT 2*

generally are not performed except when a patient reports symptoms of CAD and undergoes an NST that indicates blood-flow deficiencies. The most common invasive imaging procedure is a cardiac catheterization, in which a doctor uses a catheter inserted in the patient's blood vessels to inject contrast material into the patient's major arteries. Subsequent x rays of the patient's vessels, called angiograms, detect the contrast material and permit the diagnosing doctor to identify potential stenosis. If the angiogram is inconclusive, a doctor may order an intra-vascular **{2017 U.S. App. LEXIS 6}** ultrasound ("IVUS") to obtain more detailed images of a patient's blood-vessel walls. An IVUS is generally considered too a riskier procedure than an angiogram, and doctors typically reserve the test for patients whose angiograms indicate potentially troubling stenosis levels (between 50% and 70%) or to monitor the placement of a stent.

Once a doctor diagnoses dangerous arterial blockage, he may then prescribe one of several invasive procedures depending upon the severity of the patient's condition. One of these procedures is called percutaneous coronary intervention ("PCI"), which involves the insertion of a small wire-mesh stent into the obstructed artery. Although the insertion of a stent may improve a patient's blood flow and reduce his CAD symptoms, it cannot cure the underlying cause of CAD or prevent its progression. The insertion of a stent is also permanent; once placed, it cannot be removed. Moreover, the insertion of a stent can cause additional medical complications, including blood clotting (requiring the prescription of blood-thinning medications) and restenosis, which involves the narrowing of a previously stented artery.

Coronary bypass surgery is an even more invasive **{2017 U.S. App. LEXIS 7}** option and is typically reserved for only the most severe cases of CAD. Bypass surgery involves grafting an artery from another place in a patient's body and using it to divert blood flow around a severely blocked artery in the heart. Risks include complications from general anesthesia, stroke, and even death. Patients generally take several months to recover from bypass surgery and are required to undergo continued follow-up visits with a cardiologist for life.

B

Persaud's alleged scheme involved systemically overscheduling, over-testing, over-treating, and over-billing his patients. At each step in the medical process, from patient intake to the prescription of treatment, the government alleges Persaud improperly cut corners and intentionally overestimated the severity of his patients' conditions in order to prescribe unnecessary treatment and increase profit.

For Persaud's scheme to work, he first had to maximize his intake of patients. According to the government's witnesses, he did this by routinely overscheduling patients and falsifying the amount of time he spent with them on their medical records. Witnesses testified that Persaud scheduled two patients for every fifteen-minute **{2017 U.S. App. LEXIS 8}** block on his calendar and routinely saw upwards of 20 patients between 9 a.m. and 11:15 a.m. on any given office day. Even though Persaud spent an average of five to ten minutes in the exam room with each patient, he would indicate that he spent thirty to thirty-five minutes with each patient in the medical records. He also allegedly pressured his patients' spouses to undergo medical tests, regardless of whether they actually reported symptoms of heart disease.

For each of these office visits, Persaud also allegedly engaged in the practice of "upcoding" his patients' medical bills. The American Medical Association publishes an annual guide that assigns codes, called current procedural terminology ("CPT"), to the various procedures that a medical professional can perform. Doctors and insurance companies use these CPT codes to document medical services for insurance reimbursement. Persaud's office used four billing codes, numbered consecutively from 99212 to 99215, to document patient office visits. The codes were arranged in

A06CASES                                            5

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT 2

terms of the complexity of the visit, with 99212 indicating the least complex office visit and 99215 indicating the most complex office visit. Insurers reimbursed{**2017 U.S. App. LEXIS 9**} doctors accordingly, paying $41.06 for the least complex office visit and $136.42 for the most complex office visit. Even though Persaud only saw his patients for an average of five to ten minutes per visit, Persaud used the highest CPT code for his patients' visits the vast majority of the time. Persaud personally selected the CPT code for each of his patients and did not permit his staff to override his selection. When Persaud's billing practices attracted the attention of health-insurance auditors,4 he began to edit the existing patient files that the auditors had selected for review, adding additional notes and observations to support his inflated CPT codes.

According to the government's witnesses, Persaud also routinely required his patients to undergo unnecessary NSTs, a procedure made all the more profitable by the fact that Persaud owned an NST machine.5 Despite the fact that annual NSTs are frowned upon as unnecessary and excessive,6 Persaud subjected his patients to yearly NSTs. To justify the tests to his patients' insurers, he would use a pre-populated template form that assigned his patients the same litany of vague symptoms: "chest pain, possible angina, abnormal ECG, arrhythmia,{**2017 U.S. App. LEXIS 10**} CAD, [and] dyspnea." He also actively recruited his patients' spouses to undergo NSTs, regardless of whether they reported symptoms of CAD. On days when he conducted NSTs, he would try and process 10 in a single day, soliciting replacement patients from the adjoining hospital if one of his scheduled patients canceled. In some instances, Persaud used wheelchair-assisted replacement patients in treadmill-based NSTs, even though medical protocol requires patients who need assistance walking to undergo less physically strenuous chemical tests. Even when NSTs were prescribed appropriately, Persaud insisted on using the cheapest radioactive isotopes, refused to pay for an additional stress technician to administer the test, and rushed his patients through the procedure.

Persaud then allegedly falsified his patients' NST results in order to convince them to undergo additional catheterization testing at local hospitals. These tests produced angiograms of the patients' arteries, which gave a rough depiction of the extent of any arterial blockage. Although interpreting angiograms is an inexact science subject to reasonable differences in professional opinion, most cardiologists who interpret{**2017 U.S. App. LEXIS 11**} the same angiogram will indicate similar levels of blockage. An expert at Persaud's trial testified that the inter-observer variability between cardiologists reviewing the same angiogram will typically be within 10 percentage points of one another. In Persaud's cases, however, the inter-observer variability between Persaud and the reviewing cardiologists generally exceeded 10 percentage points, often by a large margin.7 In some instances, Persaud allegedly overestimated the amount of stenosis by over 40 or 50 percentage points and used his diagnosis to justify additional invasive procedures.

Occasionally, the angiograms would not indicate a visually obvious blockage. When this was the case, Persaud allegedly prescribed additional IVUS tests in order to fabricate higher stenosis levels. Experts at Persaud's trial testified that, as an initial matter, Persaud's use of IVUS testing on patients with visually clear angiograms was suspect because IVUS tests are intended only to be used on "close call" blockages-i.e., where the angiogram indicates potentially troubling stenosis levels. Moreover, when he did conduct IVUS tests, he frequently manipulated the results in order to produce stenosis{**2017 U.S. App. LEXIS 12**} levels high enough to justify additional interventional treatment.8

These additional treatments, in turn, permitted Persaud to accumulate even greater profits because they required his patients to undergo regular follow-up visits and tests. Both stent patients and bypass patients require additional treatments. Bypass patients, in particular, require frequent follow-up visits. In at least one instance, Persaud allegedly overestimated a patient's stenosis levels in order to refer him to bypass surgery, resulting in 7 billable office visits involving that patient in a

A06CASES

6

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*EXHIBIT 2*

single year.

C

Investigation into Persaud's medical practice began in 2012, when Persaud recommended that one of his patients undergo bypass surgery. Dr. John Coletta, chief cardiologist at St. John Medical Center, was assigned to monitor the patient until surgery could be scheduled. Coletta and catheterization-lab nurse Cathie Parsh noticed that Persaud's records severely overestimated the extent of the patient's arterial blockage. The patient's angiogram, for example, indicated stenosis levels of 30%, well below the threshold for a serious interventional procedure like bypass surgery. The patient's IVUS images appeared not{2017 U.S. App. LEXIS 13} to depict a constricted artery, but rather measurements of the inside of the guide catheter used to set the device in place. Even the symptoms listed in the patient's medical records did not match testimony by the patient, who told Coletta that he was experiencing no chest pain and had no problems engaging in moderate physical activity. Subsequent testing led Coletta to conclude that there was no reason for the patient to undergo bypass surgery.

Spurred by this discovery, Coletta spearheaded a review of all 12 of the IVUS tests that Persaud performed at St. John Medical Center on patients during the 3 months prior to the falsely referred bypass patient. Of the 11 instances where Coletta was able to obtain IVUS images from Persaud's tests, he determined that 7 of those cases involved measurements of the guide catheter rather than the artery. When Coletta confronted Persaud, he resisted Coletta's line of questioning and refused to explain why his IVUS images improperly measured the guide catheter.

Persaud's reaction to Coletta's investigation led the board at St. John Medical Center to collect more records from Persaud's stent patients-some 65 patient records in total-and send them to{2017 U.S. App. LEXIS 14} Dr. Barry George at Ohio State University for further analysis. Dr. George concluded that not only did Persaud misinterpret the IVUS images in each one of the 65 cases sent for analysis, but that 43 of the 65 stent procedures were completely unnecessary. The hospital then sent additional angiogram film on 190 of Persaud's stent patients to Dr. Hiram Bezerra at University Hospitals Case Medical Center in Cleveland, Ohio, who concluded that 174 of the 190 stents Persaud inserted were placed in blood vessels with less than 70% stenosis-the threshold at which stenting is considered medically appropriate. Other hospitals associated with Persaud also began reviewing his patients' files and uncovered similar instances of unnecessary medical procedures.9

Soon thereafter, St. John Medical Center revoked Persaud's practicing privilege and sent letters to his patients informing them that they may have received unnecessary stents. When a local newspaper picked up the story on August 31, 2012, federal investigators began to look into Persaud's medical practice for potential fraud. Significantly, on the same day that the newspaper ran the story, Persaud transferred $250,000 from his business account{2017 U.S. App. LEXIS 15} in order to open an account in his wife's name at another local bank. On October 12, 2012, federal law enforcement obtained and executed a search warrant for Persaud's office in order to secure patient records. Law-enforcement agents also served subpoenas on Persaud for additional patient files, several of which Persaud claimed not to have, but later disclosed to his patients upon their request.

As the investigation proceeded, the government hired several experts to review the details of Persaud's scheme. Dr. Ian Gilchrist, an interventional cardiologist, examined Persaud's hospital files, angiograms, and IVUS images. He reviewed a sample of 34 of Persaud's stent patients and found all of the procedures to be medically unnecessary. He further chose 10 of the original 34 samples as examples of grossly problematic conduct, and he ensured that the 10 samples chosen were taken from all three hospitals where Persaud practiced.10 Gilchrist concluded that the 10-patient sample included 14 medically unnecessary stents (7 of which were inserted in different areas than those that

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT 2

Persaud diagnosed as problematic), 13 unnecessary aortograms and angiograms, and 7 unnecessary catheterizations. Dr. {2017 U.S. App. LEXIS 16} Robert Biederman reviewed Persaud's NST practice, concluding that 16 of the 21 NSTs that were performed on Gilchrist's 10-patient sample were medically unnecessary. Biederman also took issue with Persaud's practice of prescribing yearly NSTs. Sonda Kunzi examined Persaud's billing practice using the same 10-patient sample relied upon by Gilchrist and Biederman. Kunzi determined that the 10 patients resulted in 294 billable encounters with Persaud, *of which each and every encounter was overbilled*. All of these experts testified at Persaud's trial.

D

Based on the government's investigation, a federal grand jury returned a 16-count indictment, charging Persaud with one count of health-care fraud, fourteen counts of making false statements relating to health-care matters, and one count of money laundering (on the basis of Persaud's transfer of funds to his wife). The grand jury also concluded that Persaud, if found guilty of the charges, was also required to forfeit any proceeds of the fraud.

Persaud's trial, which lasted nearly one month, involved 39 witnesses, including 14 physicians, eight patients, four nurses, and two coding experts. After hearing the evidence, the jury convicted {2017 U.S. App. LEXIS 17} Persaud on all counts, save one of the false-statement charges. The same jury later returned a special money-judgment verdict, concluding that: (1) the $343,634.67 seized from the Persauds' bank accounts was forfeitable proceeds of Persaud's health-care fraud scheme; (2) the $250,188.42 seized from Persaud's wife's account was involved in his money-laundering conviction; and (3) Persaud's scheme generated gross proceeds in the amount of $2,100,000.

The district court sentenced Persaud to 20 years of imprisonment, a $1,500 special assessment, and restitution. The district court later determined the outstanding restitution amount to be $5,486,857.03, which consists of money damages to be paid to Persaud's patients, their private insurers, and the United States. Persaud filed separate appeals challenging his conviction and sentence, the forfeiture order, the restitution order, and the district court's order denying release pending the outcome of this appeal. The first three challenges have been consolidated in this appeal; another panel has already denied Persaud's request for release. The government also filed a motion to strike portions of Persaud's brief on appeal, arguing that Persaud {2017 U.S. App. LEXIS 18} impermissibly relied on evidence that was not admitted at trial. This opinion resolves both Persaud's consolidated appeal and the government's motion.

II

Persaud argues that the government presented insufficient evidence to sustain his convictions for health-care fraud, making false statements relating to health-care matters, and money laundering. An appellant challenging his conviction on sufficiency-of-the-evidence grounds faces a high bar-Persaud's conviction must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Consequently, "we will reverse a judgment for insufficiency of the evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991) (citation omitted).

Persaud's conviction for health-care fraud was based upon his scheme in its entirety, from false diagnosis to the unnecessary stenting of patients. His convictions for making false statements, however, rely exclusively on the alleged inflation of particular patients' stenosis levels. Lastly, his

A06CASES

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*EXHIBIT 2*

money-laundering{**2017 U.S. App. LEXIS 19**} conviction requires both that his medical practice be fraudulent and that he transferred the $250,000 check, as proceeds of that fraud, to his wife.

A

To commit health-care fraud, one must "knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice to defraud any health care benefit program" or fraudulently obtain "any of the money or property owned by, or under the custody or control of, any health care benefit program in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1347. A conviction under this statute requires that the government prove beyond a reasonable doubt that the defendant "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Agbebiyi*, 575 F. App'x 624, 634 (6th Cir. 2014) (quoting *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009)). Proving fraudulent intent does not require direct evidence. Rather, "a jury may consider circumstantial evidence and infer intent from evidence of efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits."{**2017 U.S. App. LEXIS 20**} *Ibid.* (citing *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007)).

The thrust of Persaud's argument on appeal is that he was simply an overprotective cardiologist who is guilty of nothing more than relying on outdated practice methods in treating his patients. The government's experts, Persaud argues, are unfairly second-guessing his reasonable decisions with the benefit of hindsight and fail to "confront the realities and exigencies of clinical practice."

The problem with Persaud's approach, however, is that he is effectively asking this court to re-weigh the expert testimony that was presented at trial. Persaud is not arguing that the government failed to present sufficient expert testimony to prove the required elements of health-care fraud. Rather, Persaud is arguing that the government's expert witnesses were simply wrong, either because they relied upon incomplete information or made incorrect assumptions about the standards of professional medical care. But the reliability and believability of expert testimony, once that testimony has been properly admitted,11 is exclusively for the jury to decide. This court has long held the view that "[t]he weight and credibility of the testimony of [a party's] expert witnesses were for the jury."{**2017 U.S. App. LEXIS 21**} *O'Donnell v. Geneva Metal Wheel Co.*, 183 F.2d 733, 737 (6th Cir. 1950); *see also Bathory v. Procter & Gamble Distrib. Co.*, 306 F.2d 22, 25 (6th Cir. 1962) ("It was for the jury, however, to weigh the evidence, to determine the credibility of these [expert] witnesses and to cull the truth out of these seeming contradictions."); *Dickerson v. Shepard Warner Elevator Co.*, 287 F.2d 255, 259 (6th Cir. 1961) ("The weight given to lay and expert testimony and the credibility of such witnesses was for the jury to determine."). Our task on review is to determine whether any rational trier of fact, viewing the evidence presented at trial in its entirety, could find the defendant guilty beyond a reasonable doubt of all of the elements of the crime for which he was convicted. It cannot be the case that a juror acts irrationally as a matter of law when he credits the testimony of one expert witness over another.

Stated differently, Persaud's challenge fails because so much of his appeal depends on dismantling the methodology of the government's expert witnesses. Where he attempts to introduce new evidence or advance new arguments on appeal, moreover, he improperly asks this court to overturn his conviction based on evidence that was never placed before the jury. *See United States v. Ovalle*, 136 F.3d 1092, 1108 n.17 (6th Cir. 1998) ("[I]t is a rule of long standing in this court that we will not reverse on grounds not raised in the trial court." (citation omitted)); *Blakeney*, 942 F.2d at 1010 (explaining{**2017 U.S. App. LEXIS 22**} that appellate review for sufficiency of the evidence is limited

A06CASES                                     9

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT a

to "viewing the record as a whole" (citation omitted)). To make this point clear, we will address each of the arguments Persaud raises in his appeal and briefly explain why they fail to undermine the sufficiency of his convictions.

He first challenges the government's allegation that he systematically over-tested his patients and falsified the results of those tests in order to support additional interventional treatment. He begins by attacking the government's expert-witness testimony regarding NSTs, arguing that current NST practice standards-i.e., those that forbid annual NSTs on cardiac patients-are a recent development in medicine. Thus, he argues, his practice of annual testing is, at best, obsolete and not a sign of health-care fraud. He then proceeds patient by patient through the 10-patient sample and explains why, with respect to the 9 patients Dr. Biederman identified as having been prescribed 16 unnecessary NSTs, other evidence contained within each patient's record justified the procedures. Although Persaud presents alternative reasons behind his reliance on NST testing, these reasons were never presented{**2017 U.S. App. LEXIS 23**} to the jury at trial. Moreover, the government presented a wealth of uncontested evidence that supports a conviction of health-care fraud. Persaud does not challenge, for example, the fact that he owned an NST machine and thus could profit more from its use, the fact that he tried to process 10 NST patients per day and frequently solicited replacement patients to fill that quota, the fact that he used wheelchair-bound patients in treadmill-based NSTs even though chemical tests were more appropriate for patients of their condition, or the fact that he used the cheapest radioactive isotopes and rushed his patients through the procedure. *See supra* at Part I.B. This evidence, taken in conjunction with the lengthy testimony of the government's expert witnesses, could support a rational juror's conclusion that Persaud's NST practice constituted fraud.

Persaud then challenges the government's allegations with respect to his angiographic-testing practice-specifically, that Persaud improperly prescribed additional angiograms for patients whose NSTs were normal. Here, Persaud does not address each of his patients' cases individually, instead choosing to discuss his catheterization philosophy{**2017 U.S. App. LEXIS 24**} more broadly. Persaud emphasizes the fact that some of the government's experts weren't privy to his patients' long-term medical records and that angiographic testing can sometimes be appropriate where a patient discloses a family history of heart disease. Problematically, Persaud can only point to one patient, identified as RE, whose family history actually supports a prescription of further angiographic testing. The government, meanwhile, points to a range of cases in which Persaud conducted angiographic tests and inserted stents in areas of the heart that were *inconsistent with* the areas where the NSTs allegedly indicated problems. Persaud's argument on appeal is nothing more than an attack upon the reliability of the government's expert-witness testimony. A rational juror could infer fraud from the government's expert testimony and conclude that Persaud's emphasis on family history was nothing more than post-hoc rationalization.

Persaud next addresses his practice of prescribing additional IVUS tests, which he raises twice in his brief. When he first addresses IVUS testing, he emphasizes his overprotective testing philosophy rather than individual patient cases. Although he points{**2017 U.S. App. LEXIS 25**} to one patient-again, the patient identified as RE-as an example of a case where the government's witnesses at least partially agreed with his decision to prescribe additional IVUS testing, the gist of Persaud's argument is that the decision to recommend additional testing is inherently subjective. Because he knew the details of his patients' lives, Persaud argues, he was better positioned to determine whether their symptoms merited further testing. The government, however, produced expert witnesses who testified at trial that IVUS tests were designed to be used as a tie-breaking tool, intended only to clarify the extent of arterial blockage where the angiogram suggested potentially troubling stenosis levels (usually in the 50 to 70% range). A rational factfinder is entitled to rely on

A06CASES                                        10

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the government's expert testimony in concluding that Persaud's use of IVUS testing on patients whose angiograms revealed little or no arterial blockage violated this medical norm and was indicative of health-care fraud.

Persaud also argues that the government's experts lacked sufficient information to analyze properly his use of the IVUS tests. This argument focuses on the allegation that the majority{**2017 U.S. App. LEXIS 26**} of the images he took with the IVUS machine were useless because they depicted the inside of the guide catheter rather than the patient's arteries. He emphasizes that the experts only had access to the small number of images that were actually saved and preserved during the IVUS exam. Such a small sample size, he argues, is insufficient to determine whether his use of the machine was improper. He specifically points out that, in a small number of cases, the government's own experts disagreed as to whether a recorded IVUS image was of the guide catheter or of the patient's arteries. He also argues that, contrary to some of the evidence that was presented at trial, he was not responsible for what images were and were not recorded; rather, that responsibility fell to the IVUS technician.12 Again, Persaud's arguments effectively ask this court to do what it cannot do: "conceptualize our role as that of a jury, deciding the case anew." _Davis_, 490 F.3d 541. The jury, not this court, is intended to weigh the import of expert testimony and balance it against the weight of the defense's evidence. Our task is merely to determine whether a rational jury could conclude, based on the record _that was presented before_{**2017 U.S. App. LEXIS 27**} _the jury_, that Persaud's use of IVUS is indicative of health-care fraud. That the jury believed the government's experts over the defendant's experts is the jury's prerogative, not grounds to overturn the jury's decision.

Persaud then moves on to address allegations that he inserted unnecessary stents in his patients. Here, as with his arguments regarding IVUS testing, his approach is highly specific, objecting to individual experts' testimony and the evidence they presented. He makes two general arguments against the stenting allegations: (1) that the government's 70% stenosis threshold is an inaccurate oversimplification of existing medical practice, and (2) that the government's experts rendered conclusions about the appropriateness of his stenting practices based on incomplete or wrong information. Neither argument has merit.

The government introduced numerous witnesses who testified that 70% was the generally accepted threshold for arterial intervention procedures such as stenting. Some, as Persaud points out in his appeal, did testify that the 70% figure was a general guideline and that stent placement can be appropriate at lower levels of stenosis. The jury nonetheless had ample{**2017 U.S. App. LEXIS 28**} evidence to conclude that 70% was a generally accepted threshold for cardiac intervention and that, even if lower levels of stenosis might on occasion merit stenting, Persaud's practice of routine stenting amounted to health-care fraud.

The government also introduced several experts who testified that Persaud's stenting was inappropriate because of the level of stenosis recorded _by angiogram_. Persaud argues on appeal that judging the appropriateness of a stent insert by angiogram introduces "systematic error" because IVUS tests will routinely report a higher level of stenosis than an angiogram, and Persaud used IVUS tests to determine whether to place a stent. Ignoring the fact that one of the many allegations included in Persaud's indictment is that he intentionally overestimated stenosis levels in his IVUS tests, Persaud's argument fails because he is yet again effectively asking this court to impermissibly re-weigh his experts over those of the government. The credibility of the government's expert testimony, the admissibility of which is not at issue in this appeal, cannot be attacked in a sufficiency-of-the-evidence challenge, which asks whether a rational jury could rely on the{**2017 U.S. App. LEXIS 29**} expert's testimony in concluding that Persaud is guilty beyond a reasonable doubt.

Lastly, Persaud challenges the government's expert who testified that Persaud intentionally

A06CASES

11

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*EXHIBIT 2*

"upcoded" his medical bills. Here, as with the other challenges he raises, Persaud attacks only the methodology of the government's expert witness, arguing that she relied upon incomplete information. The jury had ample opportunity to hear from both parties' expert witnesses during trial. Simply because they favored the government expert's account over the account of Persaud's expert does not undermine the evidentiary basis of the jury's verdict.

From Persaud's NST testing scheme through the "upcoding" of his patients' medical bills, the government presented sufficient evidence to permit a rational factfinder to find Persaud guilty beyond a reasonable doubt of all of the elements of health-care fraud. Therefore, we affirm Persaud's conviction on this count.

C

18 U.S.C. § 1035 forbids the making of any "materially false, fictitious, or fraudulent statements or representations . . . in connection with the delivery of or payment for health care benefits, items, or services." To establish guilt, the government must prove that the defendant{**2017 U.S. App. LEXIS 30**} made these false statements knowingly and willfully. *See United States v. Hunt*, 521 F.3d 636, 648 (6th Cir. 2008). The false statements at issue in this case are Persaud's representations of specific patients' stenosis levels, which the government alleges were inflated for the purpose of justifying additional interventional procedures.

Here, just as with his arguments regarding his fraud conviction, Persaud attacks the methodology of the government's experts. Specifically, he attacks the experts' findings that his diagnosis of his patients' stenosis levels fell outside of the standard inter-observer variability range of 10 percentage points. He argues that the government's witnesses improperly compared Persaud's stenosis diagnoses, which were based on IVUS images, with expert diagnoses that were based on his patients' angiogram images. Since IVUS tests yield more precise measurements of a patient's stenosis levels, Persaud argues, any comparison between his IVUS findings and the angiogram images is akin to comparing apples and oranges. one does compare expert findings on the same test, Persaud argues that his findings fall well within the standard range of inter-observer variability.

Problematically for Persaud, however, the government's{**2017 U.S. App. LEXIS 31**} witnesses presented a different interpretation of the data to the jury. To begin with, as many of the government's witnesses pointed out, the mere fact that Persaud prescribed additional IVUS tests for patients whose angiograms revealed only minimal stenosis was itself indicative of fraudulent activity. In addition, the government's experts testified that, regardless of Persaud's angiogram readings, his IVUS readings were inherently fraudulent because he intentionally interchanged *percent diameter stenosis* with *percent area stenosis* in order to inflate his patients' stenosis values.13 Because a rational factfinder may rely upon admitted expert testimony at trial, the vast majority of which implicated Persaud in a scheme to falsify his patients' stenosis levels, he has failed to show that his false-statement convictions are not supported by evidence on the record. Therefore, we affirm Persaud's false-statement convictions as well.

D

Lastly, Persaud contests his money-laundering conviction, which is governed by 18 U.S.C. § 1957. In order to be found guilty of money laundering, "a defendant must (1) knowingly engage, or attempt to engage in a monetary transaction, (2) know that the funds involved in the{**2017 U.S. App. LEXIS 32**} transaction are criminally derived, (3) use criminally derived funds in excess of $10,000 in the transaction, and (4) use funds 'derived from specified unlawful activity.'" *United States v. Young*, 266 F.3d 468, 476 (6th Cir. 2001) (quoting 18 U.S.C. § 1957). Persaud's money-laundering conviction stems from a $250,000 transfer that Persaud made from his bank account to a bank account

A06CASES 12

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*EXHIBIT 2*

belonging to his wife on the day that a local newspaper published an article about ongoing hospital investigations into his cardiology practice.

There is no question that the $250,000 transfer exceeds the amount threshold in the money-laundering statute. The only question is whether Persaud knew that the funds were derived from specific criminal activity. He argues on appeal that, since he did not commit health-care fraud, he cannot be guilty of money laundering. Because we conclude that Persaud is guilty of health-care fraud, he is also guilty of money laundering. Therefore, we affirm Persaud's conviction on this count as well.

III

Persaud also challenged his sentence and the district court's restitution and forfeiture orders in separate cases that were consolidated with this appeal. In his appellate brief, however, Persaud failed to raise substantive arguments on any of these**{2017 U.S. App. LEXIS 33}** points, referring only to his lengthy sentence in passing in the last paragraph of his brief. Our case law makes clear that "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (alteration in original) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)). Because "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," *ibid.*, Persaud has forfeited any argument pertaining to his sentence or the district court's restitution and forfeiture orders.

IV

Persaud raises several thoughtful evidentiary arguments in his appeal. All of these issues, however, were fairly presented to the jury at trial. Persaud had every opportunity to expose the weaknesses of the government's experts through cross-examination, and by all accounts did so. The jury was entitled to accept the view of the government's experts over those of Persaud's experts. Because a rational factfinder may rely upon admitted expert testimony in determining a defendant's guilt, Persaud has not met his burden of demonstrating that his conviction was not supported by sufficient evidence. We therefore AFFIRM Persaud's convictions on**{2017 U.S. App. LEXIS 34}** all counts, his sentence, and the district court's restitution and forfeiture orders, and we DISMISS the government's motion to strike as moot.

### Footnotes

1

This amount includes $93,446.25 seized from the account of Harold Persaud and $250,188.42 seized from an account belonging to his wife, Roberta Persaud.

2

Stenting involves inserting a small mesh tube into arteries that have been weakened or narrowed by cardiovascular disease. The stent expands and supports the artery walls to permit blood to flow through the weakened arteries more easily.

3

The district court determined that Persaud owed a total amount of $5,487,663.70, but that he had earned credit for certain restitution obligations that he had already satisfied.

4

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **1:14CR276** |
| | ) | INDICTMENT |
| Plaintiff, | ) | |
| | ) | CASE NO. |
| v. | ) | JUDGE **JUDGE GAUGHAN** |
| | ) | |
| HAROLD PERSAUD, aka HARRY | ) | Title 18, United States Code, Sections 2, |
| PERSAUD, | ) | 1035, 1347, and 1957 |
| | ) | |
| Defendant. | ) | |

The Grand Jury charges:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

**A.      The Defendant and His Medical Practice**

1.      HAROLD PERSAUD, aka HARRY PERSAUD, was a licensed cardiologist in

the State of Ohio and a resident of Westlake, Ohio.

2.      PERSAUD's private medical practice was known as Harry Persaud, M.D. and

was located at 29099 Health Campus Drive, Suite 110, Westlake, Ohio.  PERSAUD had hospital

EXHIBIT 3

privileges at Fairview Hospital, St. John's Medical Center, and Southwest General Hospital ("the

hospitals").

**B.      Medicare and Private Insurance**

      3.      The Medicare Program was enacted by Congress on July 30, 1965, under Title

XVIII of the Social Security Act. Medicare provided medical insurance benefits to any person

age 65 or older, to certain disabled persons and to those with chronic renal disease who elect

coverage. Medicare was a health care benefit program within the meaning of Title 18, United

States Code, Sections 24(b) and 1347; it was a public or private plan or contract, affecting

commerce, under which medical benefits, items and services were provided to individuals.

      4.      Medicare Part A (Hospital Insurance) helped cover inpatient care in hospitals,

including critical access hospitals, and skilled nursing facilities (not custodial or long-term care).

Beneficiaries were required to meet certain conditions to receive these benefits.

      5.      Medicare Part B (Medical Insurance) helped cover doctors' services, outpatient

care, and supplies, when they were ordered by a doctor and medically necessary.

      6.      The Centers for Medicare & Medicaid Services ("CMS") was a federal agency

within the United States Department of Health and Human Services and was responsible for

administering the Medicare and Medicaid programs. CMS had the authority to make coverage

and medical necessity determinations.

      7.      Anthem Blue Cross and Blue Shield, Medical Mutual of Ohio, United Health

Care and Aetna (collectively "the private insurers") were health care benefit programs under Title

18, United States Code, Section 24(b). Often these private insurers provided secondary or

supplementary coverage to individuals who were also covered under Medicare.

2

EXHIBIT 3

## C. Reasonable and Necessary Services

8. Medicare and private insurers prohibited payment for items and services that were not "reasonable and necessary" to diagnose and treat an illness or injury. Medicare claim forms, for example, required the provider who made a claim for services to certify that the services were "medically indicated and necessary for the health of the patient." The private insurers similarly required providers to certify that services were medically necessary. In the area of cardiac disease diagnosis and treatment, a doctor, and the hospital where the doctor performs cardiac procedures, could submit claims for reimbursement to Medicare and private insurers, but they were required by law to accurately report the medical condition underlying the claim and only claims that were medically necessary were entitled to reimbursement.

## D. Cardiac Disease, Diagnosis and Treatment

9. Coronary arterial circulation of blood is fundamental to the functioning of the human heart. The following acronyms are used to describe the arteries that supply blood to the heart: LMCA (left main coronary artery); LCX (left circumflex artery); LAD (left anterior descending artery); and RCA (right coronary artery).

10. Coronary artery disease is the narrowing or blockage of the above described coronary arteries, usually caused by atherosclerosis. Atherosclerosis (or "hardening" or "clogging" of the arteries) is the buildup of cholesterol and fatty deposits (called plaques) on the inner walls of the arteries. These plaques can restrict blood flow to the heart muscle by physically clogging the artery or by causing abnormal artery tone and function. Significant Coronary Artery Disease ("CAD") was defined by the American College of Cardiology Foundation as angiographically as CAD with greater than or equal to 70% diameter stenosis of at

3

EXHIBIT 3

least one major epicardial artery segment, or greater than or equal to 50% diameter stenosis of the left main coronary artery.

11.     A nuclear stress test measured blood flow to the heart muscle both at rest and during stress on the heart. It was performed similarly to a routine exercise stress test, but through the use of an injected radionuclide such as thallium, it provided images that showed areas of low blood flow through the heart and areas of damaged or at risk heart muscle. Nuclear Stress Tests were performed by a technician at a doctor's office and were reimbursable by Medicare and private insurers when ordered by a doctor and medically necessary.

12.     An echocardiogram ("ECHO") was a diagnostic ultrasound study of the heart that used Doppler ultrasound to measure the speed of blood flow at a fixed point within the heart. An ECHO was used to assess the function of the cardiac valves, the flow of blood between the heart's chambers and to calculate the ejection fraction, or the amount of blood pumped from each chamber per heartbeat. An ECHO could be performed by a technician at a doctor's office and was reimbursable by Medicare and private insurers when ordered by a doctor and medically necessary.

13.     An electrocardiogram ("ECG" or "EKG") was a diagnostic medical test that measured the electrical activity of the heart. An ECG gave two major kinds of information. First, by measuring time intervals on the ECG, a doctor could determine how long the electrical wave took to pass through the heart. This determined if the electrical activity was normal or slow, fast or irregular. Second, by evaluating the course of electrical activity passing through the heart muscle, a cardiologist could learn if parts of the heart were electrically normal or showed signs of disease. An ECG could be performed by a technician at a doctor's office and was

4

EXHIBIT 3

reimbursable by Medicare and private insurers when ordered by a doctor and medically
necessary.

14.     Cardiac catheterization was an invasive imaging procedure used by a doctor to
evaluate, among other things, the presence of coronary artery disease, and to determine the need
for further treatment.  During a cardiac catheterization, a long, narrow tube called a catheter was
inserted into a blood vessel in the arm or leg. The catheter was guided through the blood vessel
to the coronary arteries with the aid of an x-ray machine. Contrast material was injected through
the catheter and x-ray movies were created as the contrast material moved through the heart's
chambers, valves and major vessels. The part of the procedure in which x-ray movies were made
of a coronary artery was called a coronary angiogram.

15.     An additional imaging procedure, called intra-vascular ultrasound ("IVUS"),
could be performed together with cardiac catheterization to obtain detailed images of the walls of
the blood vessels. IVUS used sound waves to enable the physician to see inside the coronary
arteries. During an IVUS procedure, an ultrasound wand was attached to the top of a catheter.
This ultrasound catheter was inserted into an artery in a patient's groin area and moved up to the
heart. A computer measured how the sound waves reflected off the blood vessels and changed
the sound waves into pictures. IVUS's primary role was in determining the size
(diameter/length) of the diseased artery segment, composition of the disease, and to check the
adequacy of stent results. IVUS was capable of making two measurements in relation to
determining whether to insert a stent in an artery. It could measure and calculate the area percent
stenosis and diameter percent stenosis. To correctly derive an area percent stenosis, one needed
to have a reference area from an angiographically appearing normal segment either immediately

Exhibit 3

above or below the diseased segment (or both) that formed the denominator of the percentage

calculation; an isolated cross-section of a coronary artery was not used as it could not assess

whether it was a diffusely diseased artery (which was not amenable to intervention) or whether it

was a focally diseased artery that could be amenable to intervention. PERSAUD sometimes used

IVUS.

16.     Fractional Flow Reserve ("FFR") was another procedure that could be performed

together with cardiac catheterization. Unlike IVUS, which assessed anatomy, FFR demonstrated

the functional performance of the artery. FFR measured blood pressure and flow through a

specific part of the coronary artery and thereby assisted in determining whether or not to perform

angioplasty or stenting on intermediate blockages. FFR was available to PERSAUD but he did

not use FFR.

17.     A cardiac stent was a device placed in a coronary artery to treat coronary artery

disease as part of a procedure called percutaneous coronary intervention ("PCI"). As a general

principle, cardiac stents were used depending on certain features of the artery blockage, such as

the size of the artery and the location of the blockage. Cardiologists and other medical

professionals sometimes referred to the blockage as a "lesion" or "stenosis." When the blockage

was severe enough, coronary bypass surgery was another procedure that could be performed. A

surgeon could perform a coronary artery bypass graft ("CABG") that restored blood flow to the

heart muscle by diverting the flow of blood around a section of a blocked artery in the heart.

18.     Medicare and private insurers would not pay for a coronary stent that was not

"medically necessary." It was generally accepted within the cardiac community that a coronary

stent was not "medically necessary" absent a diagnosis of at least a 70 percent lesion and

Ex Hi β ιΤ 3

symptoms of blockage. Medicare and private insurers likewise would not pay for a CABG that was not "medically necessary."

19.     Following placement of cardiac stents, patients were required to take certain medication regularly and they had a higher risk for additional and adverse medical conditions when undergoing certain other medical tests and procedures.

20.     Aortograms involved placing a catheter in the aorta and injection of contrast material while taking x-rays of the aorta. Renal angiograms involved placing a catheter and an injection of contrast material while taking x-rays of the arteries feeding the kidneys. Renal angiography was a tool used to define disease in renal arteries and was medically necessary only when non-invasive testing suggested disease or the patient was at increased risk for disease and non-invasive testing was not available. Aortograms and renal angiograms subjected patients to increased health risks associated with the use of contrast material, including risks of kidney failure, cancer, and the formation of clots and debris that could cause strokes or loss of circulation. Aortograms and renal angiograms were separately reimbursable by Medicare and private insurers.

**E.      Billing**

21.     The American Medical Association assigned and published five digit codes, known as the Current Procedural Terminology (CPT) and Level 1 Healthcare Common Procedure Coding System (HCPCS) codes. The codes were a systematic listing of procedures and services performed or ordered by health care providers. The purpose of the terminology was to provide uniform language that accurately described medical, surgical, and diagnostic services and supplies, thereby providing an effective means for reliable nationwide communication

7

EXHIBIT 3

among physicians, patients and third parties. The procedures and services represented by CPT

and HCPCS codes were health care benefits, items, and services within the meaning of Title 18,

United States Code, Section 24(b).

## THE SCHEME AND ARTIFICE TO DEFRAUD

22.     From on or about February 16, 2006, through on or about June 28, 2012,

Defendant HAROLD PERSAUD, aka HARRY PERSAUD, did devise and intend to devise a

scheme and artifice to defraud and to obtain money from federal health care benefit programs by

means of false and fraudulent pretenses, representations and promises.

It was part of the scheme to defraud that at various times:

23.     PERSAUD submitted billings to Medicare and the private insurers for office

evaluation and management of patients. PERSAUD selected the billing code for each customer,

and PERSAUD's staff then submitted that billing code to Medicare and the private insurers on

PERSAUD's behalf. PERSAUD used codes that reflected a service that was more costly than

that which was actually performed. PERSAUD received payment from the patients' insurance

companies based on the submission of claims with these inflated billing codes. PERSAUD

billed most office visits with CPT Code 99215, the highest code level and reimbursement rate,

without medical necessity documented for that code.

24.     PERSAUD performed Nuclear Stress Tests on patients that were not medically

necessary.

25.     PERSAUD knowingly recorded false results of patients' Nuclear Stress Tests to

justify cardiac catheterization procedures that were not medically necessary.

26.     PERSAUD performed cardiac catheterizations on patients at the hospitals and

8

_EXHIBIT 3_

falsely recorded the existence and extent of lesions observed during the procedures in medical records required to be kept by health care benefit programs.

27.     PERSAUD recorded false symptoms in patient records to justify testing and procedures on patients.

28.     PERSAUD inserted cardiac stents in patients who did not have 70 percent or more blockage in the vessel that he stented and who did not have symptoms of blockage.

29.     PERSAUD used IVUS to evaluate the level of stenosis in an artery when it was medically unnecessary to use IVUS.

30.     When using IVUS, PERSAUD knowingly and improperly recorded the area percent stenosis in order to obtain a high enough number – which was then falsely represented as a diameter stenosis measurement – to justify insertion of a stent. Persaud initiated an area percent stenosis calculation by measuring the angiographically appearing abnormal segment but did not obtain a proper reference point to complete the calculation by obtaining measurement(s) at an angiographically appearing normal segment(s).

31.     PERSAUD placed a stent in a stenosed artery that already had a functioning bypass, thus providing no medical benefit and increasing the risk of harm to the patient.

32.     PERSAUD improperly referred patients for coronary artery bypass surgery when there was no medical necessity for such surgery, which benefitted PERSAUD by increasing the amount of follow-up testing he could perform and bill to Medicare and the private insurers.

33.     PERSAUD performed medically unnecessary cardiac stent procedures on his patients.

34.     PERSAUD performed medically unnecessary aortograms on his patients.

EXHIBIT 3

35.     PERSAUD performed medically unnecessary renal angiograms on his patients.

36.     PERSAUD performed medically unnecessary procedures on his patients and ordered medically unnecessary testing for his patients.

37.     PERSAUD caused false and fraudulent claims to be submitted to health care benefit programs.

38.     PERSAUD understood that patients who underwent cardiac stent procedures were more likely to become regular patients of his practice and would provide opportunities for frequent follow up visits and testing.

39.     PERSAUD ordered that his cardiac patients have unnecessary routine follow up visits and undergo unnecessary diagnostic testing such as Nuclear Stress Tests, ECHOs, and ECG or EKG procedures.

40.     PERSAUD caused claims for medically unnecessary procedures, services and testing to be submitted to health care benefit programs.

41.     As a result of the scheme, PERSAUD overbilled and caused the overbilling of Medicare and private insurers in the amount of approximately $7.2 million, upon which claims Medicare and the private insurers paid approximately $1.5 million.

### COUNT 1
(Health Care Fraud – 18 U.S.C. § 1347)

42.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41 of the Indictment as if fully set forth herein.

43.     From on or about February 16, 2006, through on or about June 28, 2012, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant HAROLD PERSAUD,

_EXHIBIT 3_

aka HARRY PERSAUD, knowingly and willfully executed, and attempted to execute, a scheme

and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18,

United States Code, Section 24(b), that is Medicare and the private insurers, and to obtain by

means of false and fraudulent pretenses and representations described herein, money and

property owned by, and under the custody and control of Medicare and private insurers, in

connection with the delivery of and payment for health care benefits, items, and services, in

violation of Title 18, United States Code, Sections 1347 and 2.

The Grand Jury further charges:

## COUNT 2
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

44.    The Grand Jury realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 41 of the Indictment as if fully set forth herein.

45.    When a medical provider performed a cardiac catheterization and inserted a stent,

the provider was required to accurately document and maintain a medical record of his findings

for treating the patient, any intervention and subsequent reimbursement. In the cardiac

catheterization labs at the hospitals, PERSAUD documented his findings in medical records such

as the "Cardiology Catheterization Report," "Cardiology Procedure," "Cardiac Catheterization"

and "Cardiac Catheterization Report" (collectively the "Catheterization Report").

46.    Medicare and private insurers had the authority to conduct reviews of claims for

medical necessity and to require the provider of services to produce medical records to support

any claim made. A review of medical records enabled Medicare and private insurers to confirm

that the services furnished were reflected on the claim as well as the medical necessity of the

11

_EXHIBIT 3_

service provided.

47.　On or about March 23, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient CB to state that the lesion in Patient CB's RCA was 60 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 60 percent and, in fact, was less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 3
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

48.　The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

49.　On or about July 7, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a

12

Case: 1:14-cr-00276-DCN Doc #: 1 Filed: 08/20/14 13 of 23. PageID #: 13

EXHIBIT 3

materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient MG to state that the lesion in Patient MG's LAD was 80-90 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 80-90 percent and, in fact, was less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 4
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

50.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

51.     On or about August 25, 2010, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient MG to state that the lesion in Patient MG's RCA was 75 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent

EXHIBIT 3

statement and entry, in that the lesion was substantially less than 75 percent and, in fact, was less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

### COUNT 5
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

52.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

53.     On or about June 2, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient GG to state that the lesion in Patient GG's LAD was 72 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 72 percent and, in fact, was less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

14

EXHIBIT 3

## COUNT 6
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

54.   The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

55.   On or about May 18, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient SH to state that the lesion in Patient SH's RCA was 70 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 7
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

56.   The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

57.   On or about March 24, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false,

EXHIBIT 3

fictitious, and fraudulent statement and representation, and made, caused to be made, and used a

materially false writing and document knowing the same contained a materially false, fictitious,

and fraudulent statement and entry, in connection with the delivery of and payment for health

care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization

Report of Patient AK to state that the lesion in Patient AK's LAD was 71 percent, then well

knowing that the Catheterization Report contained a materially false, fictitious and fraudulent

statement and entry, in that the lesion was substantially less than 71 percent and, in fact, was less

than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

### COUNT 8
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

58.     The Grand Jury realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

59.     On or about February 28, 2011, in the Northern District of Ohio, Eastern Division,

Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care

benefit program, did knowingly and willfully make, and cause to be made, a materially false,

fictitious, and fraudulent statement and representation, and made, caused to be made, and used a

materially false writing and document knowing the same contained a materially false, fictitious,

and fraudulent statement and entry, in connection with the delivery of and payment for health

care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization

Report of Patient JR to state that the lesion in Patient JR's RCA was 71 percent, then well

16

E+HIBIT 3

knowing that the Catheterization Report contained a materially false, fictitious and fraudulent

statement and entry, in that the lesion was substantially less than 71 percent and, in fact, was less

than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 9
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

60.     The Grand Jury realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

61.      On or about February 26, 2010, in the Northern District of Ohio, Eastern Division,

Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care

benefit program, did knowingly and willfully make, and cause to be made, a materially false,

fictitious, and fraudulent statement and representation, and made, caused to be made, and used a

materially false writing and document knowing the same contained a materially false, fictitious,

and fraudulent statement and entry, in connection with the delivery of and payment for health

care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization

Report of Patient JR to state that the lesion in Patient JR's LAD was 70 percent, then well

knowing that the Catheterization Report contained a materially false, fictitious and fraudulent

statement and entry, in that the lesion was substantially less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

17

*EXHIBIT 3*

## COUNT 10
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

62.    The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

63.    On or about February 26, 2010, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient JR to state that the lesion in Patient JR's Circumflex was 60-70 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 60-70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 11
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

64.    The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

65.    On or about August 31, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false,

*EXHIBIT 3*

fictitious, and fraudulent statement and representation, and made, caused to be made, and used a

materially false writing and document knowing the same contained a materially false, fictitious,

and fraudulent statement and entry, in connection with the delivery of and payment for health

care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization

Report of Patient DS to state that the lesion in Patient DS's RCA was 60-70 percent, then well

knowing that the Catheterization Report contained a materially false, fictitious and fraudulent

statement and entry, in that the lesion was substantially less than 60-70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 12
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

66.    The Grand Jury realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

67.    On or about August 31, 2011, in the Northern District of Ohio, Eastern Division,

Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care

benefit program, did knowingly and willfully make, and cause to be made, a materially false,

fictitious, and fraudulent statement and representation, and made, caused to be made, and used a

materially false writing and document knowing the same contained a materially false, fictitious,

and fraudulent statement and entry, in connection with the delivery of and payment for health

care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization

Report of Patient DS to state that the lesion in Patient DS's Left Main was 60 percent, then well

knowing that the Catheterization Report contained a materially false, fictitious and fraudulent

_EXHIBIT 3_

statement and entry, in that the lesion was substantially less than 60 percent and, in fact, was substantially less than 50 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

### COUNT 13
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

68.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

69.     On or about December 29, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry in the Catheterization Report of Patient JS to state that the lesion in Patient JS's LAD was 60-65 percent, then well knowing that the Catheterization Report contained a materially false, fictitious and fraudulent statement and entry, in that the lesion was substantially less than 60-65 percent and, in fact, less than 70 percent.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

20

EXHIBIT 3

## COUNT 14
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

70.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

71.     On or about May 25, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry on the billing sheet for Patient GG to state that GG was suffering from chest pain and angina, then well knowing that the billing sheet contained a materially fictitious, and fraudulent statement and entry, in that GG did not then suffer from chest pain and angina.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

## COUNT 15
(False Statement Relating to Health Care Matters – 18 U.S.C. § 1035)

72.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

73.     On or about December 14, 2011, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, in a matter involving a health care benefit program, did knowingly and willfully make, and cause to be made, a

EXHIBIT 3

materially false, fictitious, and fraudulent statement and representation, and made, caused to be made, and used a materially false writing and document knowing the same contained a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, PERSAUD caused an entry on the medical record for Patient JS to state that JS was suffering from chest pain and dyspnea, then well knowing that the medical record contained a materially fictitious, and fraudulent statement and entry, in that JS did not then suffer from chest pain and dyspnea.

All in violation of Title 18, United States Code, Sections 1035 and 2.

The Grand Jury further charges:

**COUNT 16**
(Engaging in Monetary Transactions in Property Derived from
Criminal Activity – 18 U.S.C. 1957)

74.    The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 41, 45 and 46 of the Indictment as if fully set forth herein.

75.    On or about August 31, 2012, in the Northern District of Ohio, Eastern Division, Defendant HAROLD PERSAUD, aka HARRY PERSAUD, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is Defendant HAROLD PERSAUD, aka HARRY PERSAUD, made a transfer of $250,000, via check number 3776, from PERSAUD's business bank account at Key Bank, identified by account number XXXXXXX246, to a certificate of deposit (CD) at Ohio Savings Bank in the name of PERSAUD's wife, identified by account number XXXXXXXXX442, such property having been derived from a specified unlawful activity, that is, health care fraud, as alleged in

22

*EXHIBIT 3*

Count 1 of this Indictment.

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## FORFEITURE

76.     For the purpose of alleging forfeiture pursuant to Title 18, United States Code,

Section 982, the allegation of Counts 1 through 16 are incorporated herein by reference. As a

result of the foregoing offenses, defendant HAROLD PERSAUD, aka HARRY PERSAUD, shall

forfeit to the United States any property involved in charges set forth herein, or any property

traceable to such property and/or any property that constitutes or is derived, directly or indirectly,

from the gross proceeds traceable to the commission of the charges set forth herein; including,

but not limited to, the following:

a.     Money Judgment in the amount equal to the proceeds Defendant HAROLD

PERSAUD, aka HARRY PERSAUD, obtained as a result of such violations;

b.     $93,446.25 in U.S. Currency, seized from Key Bank Account #XXXXXX6246 in

the name of Harold Persaud; and,

c.     $250,188.42 in U.S. Currency, seized from Ohio Savings Bank Account

#XXXXXXXX8442 in the name of Roberta Persaud.


                                        A TRUE BILL.



Original document -- Signatures on file with the Clerk of Courts, pursuant to the E-Government
                                    Act of 2002.

                                           23

_EXHIBIT A_

## THE MERITS ISSUE

DR. PERSAUD WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED UNDER THE SIXTH AMENDMENT TO THE CONSTITUTION WHEN HIS TRIAL COUNSEL FAILED TO PROPERLY ADVISE HIM OF THE SENTENCING CONSEQUENCES OF A GUILTY VERDICT AT TRIAL VERSUS THE SENTENCING CONSEQUENCES OF A GUILTY PLEA, AND HAD DR. PERSAUD BEEN PROPERLY ADVISED HE WOULD IIAVE PLED GUILTY INSTEAD OF GONE TO TRIAL AND WOULD HAVE AND RECEIVED A LESSER SENTENCE.

Dr. Persaud's case is an open book when it comes to the sentencing consequences he was advised going into the trial and upon which he made the decision try his case rather than enter a guilty plea. The Government filed August 17, 2015 a document styled "Motion for Inquiry Under Missouri v. Frye." [Doc. 40] In this pleading the Government expressly stated that the Government had made a plea offer to the defense and wanted the Court to conduct an inquiry on the record with the defendant to insure that this plea offer had been communicated by defense counsel to the defendant personally.

> [T]he United States requests the Court to conduct a colloquy on the record with the parties to ascertain whether defense counsel communicated the government's plea offer to the defendant and whether defendant Persaud has rejected that plea offer in favor of exercising his Sixth Amendment right to a jury trial.

[Doc. 40, pp. 2-3]

Oddly, four days later, August 21, 2015, (and just ten days before the start of

12

## EXHIBIT 4

trial) defense counsel filed a written response *denying there had ever been a plea*

*offer from the Government and affirming in writing that he had never communicated*

*any plea offer to the defendant.*

> [T]he Government has not made Counsel aware of any plea offers.
> Defense Counsel has therefore not been able to communicate any details
> about potential plea offers. The Defendant does not object to a colloquy
> on the record, but he wishes this Court to know that no plea offers have
> been communicated to Defense Counsel.

[Doc. 43]

The defense claim that the Government had never communicated any plea offer

despite the Government's written assertion that it had done so, was never resolved on

the record.  Instead, on the morning of jury selection the following dialogue took

place before the jury was selected:

> THE COURT: Ms. Rice, you wanted to put
> something on the record first?
>
> MS. RICE: Yes, Your Honor. With respect
> to the potential plea discussions and any plea that was
> offered from the time of indictment until now, Your
> Honor, there's been no indication that the defendant
> wished to receive any plea offer from the United States.
>          So as it stands now, if the defendant were
> to plead guilty, he would receive the three levels for
> acceptance of responsibility which at this time we
> believe -- just verifying the numbers -- it would be a
> base offense level of six under 2B1.1, plus a 20, plus
> two for special skill, plus two for health care fraud
> offense, according to the government of health care of

13

*EXHIBIT 4*

more than a million dollars, and plus an additional two
for more than ten victims.

  And there may be additional enhancements,
but at this time that's what we believe the Guideline
range would be, resulting in an offense level of 32.
Without acceptance, 121 to 151 months.

  If the defendant were to plead guilty and
receive three levels for acceptance, he would be at a 29,
87 to 108 months, Your Honor.

  And it's our understanding, again, that the
defendant at no time was interested in a plea offer and
maintains his innocence.


THE COURT: Mr. Hilow.

MR. HILOW: Your Honor, that plea, we were
made aware of that at our pretrial. I reviewed that with
my client, and at this time he does not wish to accept
the plea as recommended by the government, or I shouldn't
say "recommended, " but as outlined by the government.

THE COURT: Dr. Persaud, is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. We do this not because
we're trying to influence you or do anything at all.
It's just that the higher Courts seem to think that what
happens is I'm not suggesting this in this case at all,
but what happens a lot of times is that once the case
goes to trial and if someone's convicted and then eight
years later they say, "Oh, I would have pled guilty had I
known I could have done this," and it's kind of too late
then.

  And so we're now obligated to go over this
with every -- in every case beforehand. So I'm not
trying to influence you at all, but just when the

14

EXHIBIT 4

government puts out what they claim their position is,
and then you and your lawyers say the same thing.
    So as I understand it, you wish to maintain
your plea of not guilty and go to trial?

THE DEFENDANT: Yes, sir.

THE COURT: Thank you.

[Doc. 183, pp. 3-5]

This was the agreed upon advice given Dr. Persaud immediately before the

start of trial and the advice on which we know he based his decision to go to trial -

that if he pled guilty (with or without a formal plea agreement), his sentencing

guideline range would be 87-108 months - 7 years and 3 months on the low end of

the guideline range - or if he went to trial and lost his guidelines would be 121-151

months - 10 years and 1 month on the low end, in other words, a spread of 34 months.

Given that at the time of the trial the good behavior credit time was 54 days per year

of imprisonment, a 34 month higher sentence would have resulted in an additional 29

½ months imprisonment. According to the sentencing advice he was given and upon

which he based his decision to risk trial, he was putting himself at risk for a little less

than two and a half years prison time. Given that a not guilty verdict, if achieved,

would have saved him from any prison time and saved his personal assets from any

forfeiture, and save his medical license and medical career, to risk an additional two

EXHIBIT 5

clearly revealed. (Ex.RWB2, App'x 1847; Ex.MH5, Suppl. App'x 1961.)

The procedure was warranted despite the government's hyperbolic characterization of MH's conversation with Dr. Persaud, in which she simply wished to know the *worst* that could happen should she decline to undergo the test. (R.189, Tr., MH, PageID4601.) The government says that "Persaud told MH that if MH did not have the procedure MH would 'have a heart attack and die'"—undoubtedly a tendentious recasting of a conversation typical of those that occur regularly between patients and doctors who are ethically and legally obliged to explain the risks of proceeding (or not proceeding) with a contemplated course of treatment. Given MH's undeniably serious risk factors, Dr. Persaud's answer was correct. The fact that MH was nervous and may have "broken out in hives" upon learning that she needed a cath is irrelevant to whether she in fact needed one. Such news, of course, could make anyone nervous.

## VI. The reviewers' criticisms of Dr. Persaud's use and interpretation of IVUS were inconsistent and inadequate to prove intent.

The government recounts the events leading up to its investigation of Dr. Persaud, including the case—RE—that initially aroused suspicion. Br. at 29 ff. Despite providing a detailed discussion of Dr. Barry George's review of an initial batch of 65 cases, however, the government neglects to discuss

*EXHIBIT 5*

George's most crucial testimony—that <u>the entire investigation could well have been based on a mistake.</u>

As discussed at length in Dr. Persaud's opening Brief, George conceded that "Dr. Persaud may have a point in his letter regarding the technical inefficiency, equipment malfunction or poor recordings." (R.186, Tr., Page ID#3706.) "[I]f there were technical issues," Dr. George also acknowledged, "it was the technician not recording when they were supposed to be recording." (*Id.* at PageID#3708.) Despite this pivotal testimony, however, the government's Brief does not so much as mention the issue. (Reviewers regardless lacked sufficient materials to second-guess Dr. Persaud, since <u>few hospitals actually *store* full IVUS runs.</u> (R.194, Tr., Magorien, PageID#6177).)

Despite his admitted lack of interpretable materials, George claims that Dr. Persaud misinterpreted IVUS in "every single case" of the first batch of 30 patients he reviewed. (R.186, Tr., George, PageID#3706.) But this should come as no surprise, since Coletta had given him his own set of hand-selected cases that, for him, "specifically raised concerns." George's evaluation, moreover, was unavoidably tainted by Coletta's own impressions. (R.186, Tr., George, PageID#3741.)

*EXHIBIT 6*

plus years at trial was a decision probably any professional in Dr. Persaud's position would have made virtually irrespective of the evidence in the case.

However, we know that this advice was egregiously wrong. After being convicted at trial, the United States Probation Office prepared a Presentence Investigation Report ("PSR") which correctly calculated his guideline range as **LIFE**. [PSR, ¶ 77] At sentencing this Court accepted a concession from the Government which the Government was not required to have made, that fairness dictated that the loss amount not be determined as required by the guidelines, which used an intended loss number (a result dictated by statute as well, being mandated by the Affordable Care Act), but instead be determined based on an actual loss amount, which reduced the guideline range to 292-360 months and the Government asked for a 25 year sentence. [Doc. 133; pp. 134-135; p. 166] Based on Dr. Persaud's good character otherwise, this Court departed downward to a range of 235-293 months and imposed a sentence of 240 months - twenty years imprisonment. [Doc. 133, p. 169]

Dr, Persaud is prepared to testify under oath at an evidentiary hearing that had he been advised before trial that his sentencing guidelines would be **LIFE** and that even with a Government making a voluntary concession to reduce his guidelines and a downward variance that his sentence would be twenty years, that he would never have taken the case to trial, but would have pled guilty. See *Byrd v. Skipper*, 940

16

## The Case Against Hilow's Representation     EXHIBIT 7

Ineffective Assistance of Counsel

4 factors
    a. Whether the lawyer had previously handled criminal cases of similarity.
    b. Whether strategic trial tactics were involved in the action.
    c. Whether the defendant was prejudiced as a result of the lawyer's incompetence.
    d. Whether the ineffectiveness was due to matters beyond the lawyer's control.

Conflict of Interest: (Concurrent Representation)
  Tamir Rice Case (Conflicting Interest)
  One other big case at the time denied me a fair trial

General Reasons for His Ineffectiveness

1. Not his kind of case (malpractice)
2. Trial of 3½ weeks for prosecution; 1½ days for defence
3. The main claim "that technicians were not recording when they were supposed to" - would have killed the case if he argued it with Barry George NEW EVIDENCE
4. Did not have specialists expand when they said "all IVUS not necessarily recorded"
5. Did not put me on the stand
6. Did not force Debbie Coblenz to give testimony. Her testimony would have been critical. Why did she not show up in court?
7. Did not put enough expert enough experts for the defence
8. Did not evaluate my case properly; Chandra Group found that Coletta tainted Bary George's opinion.
9. Did not expand on the case of Elsasser.
10. Did not question why Gilchrist was using cath % blockage and not IVUS % blockage. He did not even challenge IT. He did not review the exhibits properly. Exhibits showed cath blockage; not IVUS
11. Hilow did not study presentations before the trial
12. Hilow reviewed witness material just before they were put on the stand
13. He did not mention that of the 16 lawsuits filed as a result of St. John's letter; 10 were dropped within 1 year because there was supportive evidence in the hospital chart of the need for stenting 2 went to trial and I won both. 4 were settled after my conviction
14. Did not advise me that if convicted I faced 20 years in prison. Told me I would go to a camp.
15. Did not conduct pretrial interviews of the Government's witnesses.
16. Failed to communicate a plea bargain offer
17. Never properly explained to me the risks and benefits of proceeding to trial, as opposed to accepting a plea.
18. Said I would "win on appeal". Did not try hard enough to win himself
19. Failed to conduct adequate witness questioning at trial. Could have killed the case when Barry George said "the technicians were not recording." Did not bring in cath lab staff witnesses.
20. Did not maintain any contact with me during the Appeal process

1

3

EXHIBIT 8

_____76060 - PERSAUD, HAROLD - Unit: LOR-K-B

----------------------------------------------------------------

Holderman, Gretchen
60376060
SUBJECT: RE: Letter to pardon atty
ATE: 07/02/2021 11:21:27 AM

ello Harry.  I need all the contact information for your pardon attorney including an email if you have it so I can send my letter
ectronically.  Below is the letter I propose to send:

RAFT DRAFT DRAFT

ear _____

write this letter concerning your client, Harold Persaud, who I understand is seeking a presidential pardon.  Indeed, a more
orthy pardon candidate, I cannot imagine.

s you may know, my law firm represented Dr.. Persaud in connection with a post-conviction Petition for Writ of Habeas Corpus
led pursuant to Title 28 United States Code Section 2255.  Unfortunately, that petition was summarily denied by the United
tates District Court which further denied a certificate of appealability.  The District Court's decision was upheld by the United
tates Court of Appeals for the Sixth Circuit and thus the issues raised on Dr. Persaud's behalf were barely considered and the
egal arguments raised in his 2255 Petition were never reviewed.  To say we were greatly disappointed by the courts' wholesale
efusal to review the underlying issues in Dr Persaud's case would be a gross understatement.

n reviewing the complete record of Dr. Persaud's trial, it was quite apparent that the government planned and carried out a
low and deliberate character assassination of Dr. Persaud from Voir Dire through closing arguments.  The government painted
r. Persaud as an arrogant, impersonal, and unskilled practitioner, who performed unnecessary cardiac procedures on his
atients.  The subjective evidence did not support such a portrayal.  Rather than delving into the science of cardiology where it
vas possible, the trial court allowed the government to essentially elicit "expert" testimony from each of it's many physician
vitnesses.  Most of said witnesses were Dr. Persaud's colleagues who, quite frankly, did not like him.  Whether they were
ealous of his successes, or had other prejudices against him, it was no secret that Dr. Persaud was not popular with many of
he doctors and staff with whom he worked.  He was hard-working and competitive and did not hold back criticism when he
elieved others to be less skillful or too casual in their approaches to medicine.

Our 2255 pleadings laid out in great detail the injustices Dr. Persaud has been forced to suffer.  His prosecution was ill-
conceived and his conviction tragic.  Dr. Persaud is serving an extraordinarily harsh sentence for his subjective analysis and
medical judgments which were not deemed malpractice.

During our representation of Dr. Persaud, he did complain that his trial lawyer did not advise him about a possible plea
resolution.  I contacted Dr. Persaud's trial lawyer and learned that there had been no substantive plea discussions with the
United States Attorney's office because Dr. Persaud had been adamant that he was innocent and wanted to go to trial.
Accordingly, we did not pursue any plea-related issues within Dr. Persaud's 2255 petition.  I realized much later that what Dr.
Persaud was actually complaining about was the fact that his lawyer did not explain to him the severe penalties he would be
exposed to if he was convicted at trial as compared to those he might otherwise face if he agreed to enter into a plea
agreement.

I still strongly believe in Dr. Persaud's innocence.  At worst, Dr. Persaud was too cautious a physician who did too much to
protect his patients when he felt they were in need of cardiac care and treatment.

I sincerely hope you will be able to obtain a successful result on Dr. Persaud's behalf.  Please do not hesitate to contact me if
you require any additional information.

DRAFT DRAFT DRAFT

HAROLD PERSAUD on 7/1/2021 5:35:40 PM wrote
gretchen,
You probably should mention in the letter that I should be considered fo a full pardon because you have
reviewed the testimony and see that I did nothing wrong and that I was maliciously prosecuted probably based on race. Thanks
-----Holderman, Gretchen on 6/16/2021 12:21 PM wrote:



## *Harry Persaud M.D. FACC*

### CARDIOLOGY



29099 Health Campus Drive
Building 3 • Suite #110
Westlake, Ohio 44145
(440) 835-6169

### NUCLEAR MYOCARDIAL PERFUSION SCAN REPORT

PATIENT: ▮▮▮▮▮▮▮▮▮
SEX:M          AGE:▮▮▮▮▮▮
REFERRING PHYSICIAN :          INTERPRETING PHYSICIAN: H. PERSAUD
DATE:08/08/2012                          STRESS PHYSCIAN: H. PERSAUD

INDICATIONS: CHEST PAIN-POSSIBLE ANGINA. ABNORMAL EKG. ARRYHTHMIA. CAD.
    DYSPNEA.
FOR STRESS TEST/EKG PORTION SEE STRESS REPORT

Myocardial Perfusion Protocol:

            DOSE:
                Thallium:      03.2 mCi          rest
                Cardiolite:    38.9mCi           stress
                Saline:        5 cc

RESULTS:
Study Quality: Good
LV Cavity Size: ENlarged
Lung Uptake: None
Right Ventricle: Normal
SPECT Result:  Mild inferoapical reversible ischemia . Large inferior apical and lateral
scar.

LVEF:INormal. 35%

IMPRESSION:
Stress tolerance: Fair
Exercise Symptoms: Dyspnea
 No Significant reversible ischemia .Scarring as above.Correlate clinically.

CC.

Signed

Harry Persaud, MD    08/08/12

Patient called. Continue medical therapy .

# Harry Persaud M.D. FACC
## CARDIOLOGY



# Global Consent Form

My physician has recommended that I undergo a procedure known as a single photon emission computed tomography (SPECT) test. This test will show the amount of blood circulation within my heart. The information thus obtained will help my physician evaluate the condition of my heart. The purpose of this form is to document my informed consent to the procedure.

An IV will be started in one of my veins. The test consists of a radioactive isotope (Thallium, Cardiolite, or Myoview) being injected into my vein through the IV site at two intervals during the test. As a part of this test, my heart rate, blood pressure and respirations may be increased either through exercise or through the use of drugs. Please check the appropriate box for:

         [ ] Pharmacological Stress Test      [X] Exercise Stress Test

During the performance of the test, my pulse, blood pressure and electrocardiogram will be monitored. As with any medical procedure of this nature, the test entails certain risks. These include but are not limited to the rare possibility of a serious complication occurring during the test, such as a severe allergic reaction or heart attack, potentially resulting in sudden death. Every effort will be made to minimize the possibility of such complications by the preliminary examination prior to the test and by observations during the test. Emergency equipment and trained personnel are available to deal with unusual situations, which may arise. Further, due to the heightened security measures that have been instituted nationally by the government since 9/11/01, it may be that the small amount of radioactive material that remains in your body would trigger some of the more sensitive devices designed to detect persons carrying radioactive materials. **In order to avoid any unnecessary public disruption and/or embarrassment, please carry this Global Consent Form with you for 3 days to alert authorities, if necessary, of your recent Nuclear Cardiology test.**

1. Sex: [ ] Female   [ ] Male   Date of Birth: _____ Social Security #: _____ _____
2. If female, are you currently pregnant, possibly pregnant, or breastfeeding?   [ ] Yes   [ ] No
3. Radionuclide administered and its activity: 23mG 201 TR 36mG 99mTC

**Nursing mothers injected with Tl201 should refrain from breast-feeding for 2 wks**

4. Do you have any latex allergies?   [ ] Yes   [ ] No
5. Are you currently taking or have you taken in the last 72 hours Viagra, Vigromax, Levitra, Cialis, or any other drug with similar properties? [ ] Yes   [ ] No
6. Are there any other medications you have taken within the last 72 hours, including natural remedies, which we have not discussed?    If yes, list _____
7. Physician's Name:     HARRY PERSAUD, M.D.
8. Physician's Clinical Site:     29099 Health Campus Dr. #110    WESTLAKE, OHIO 44145
9. Physician's 24/7 Telephone Number: 440-835-6169

**CONSENT:** I certify that my physician has explained the risks of the procedure described above; that I have had an opportunity to ask questions and those questions have been answered; and that I voluntarily grant informed consent for the Procedure.

_____ _____ _____ _____
Patient Signature            Date         Print Patient Name        Date

4430 GRANT R MEDINA OH. 44256    (330) 923-1342
Patient Address     City          State   Zip     Home Phone    Cell - 330-416-8715

Witness _____           Date: _____

| Mid-Atlantic | Southeast | Midwest | West |
|---|---|---|---|
| 7584 Morris Ct., Suite 228 | 7822 Causeway Blvd. | 11676 Perry Highway, Ste. 1203 | 13950 Stowe Dr. |
| Allentown, Pa. 18106 | Tampa FL 33619 | Wexford, PA 15090 | Poway, CA 92064 |
| 610-366-3934 (Phone) | 813-620-3800 (Phone) | 866-220-0354 (Phone) | 858-726-1341 (Phone) |
| 610-366-1483 (Fax) | 813-620-090 9 (Fax) | 866-220-0363 (Fax) | 858-726-1709 (Fax) |

White Copy- DIS    Green Copy- Patient    Pink Copy-Physician      DISF036 Rev K

_EXHIBIT 9_

## NUCLEAR LAB CHARGE TICKET

Date of service: _8-8-12_                Patient Name: ~~[redacted]~~

Referred By:_____

### THALLIUM STRESS TEST

78452_____ Camera Spect/Gated wall motion
               and ejection fraction

93015_____ Treadmill Interp. & Phy. Present

93000-59_____ EKG

A9500_____ Cardiolite

A9505_____ Thallium per mili-curi X 4

A9502_____ Myoview

96374-59_____ Injection Isotope

36000-59_____ Intra-catheter & IV Hook-up

$\begin{array}{c} B \\ 8\text{-}8\text{-}12 \\ SC \end{array}$

93306_____ Echocardiogram
               Echo M-Mode/2D Doppler &
               Color Flow

### DIAGNOSIS CODES FOR THALLIUM STRESS

_____ 786.51 Precordial Pain

_____ 794.31 Abnormal EKG

_____ 414.01 Atherosclerosis nat. Cor.art

_____ 426.3 Left Bundle Branch Block

_____ 426.4 Right Bundle Branch Block

_____ 414.04 Cor. Athrscl. BPG

_____ 427.31 Atrial Fibrillation

_____ 428.0 CHF

_____ 786.50 Chest Pain

_____ 401.9 Unspecified
           Hypertension
_____ 413.0 Angina decubitus

_____ 411.0 Post-Myocardial
           Infraction syndrome
_____ 780.2 Syncope & collapse

### DIAGNOSIS CODES FOR ECHO

_____ 424.1 Aortic Valve Disorder
_____ 429.3 Cardiomegaly
_____ 425.4 Cardiomyopathy
_____ 785.2 Murmur
_____ 424.0 Mitral Valve Disorder
_____ 424.2 Tricuspid Valve Disorder
_____ 429.3 Ventricular Hypertrophy

EXHIBIT 10



NATIONAL ARCHIVES and RECORDS ADMINISTRATION
8601 ADELPHI ROAD · OGIS | COLLEGE PARK. MD 20740-6001

www.archives.gov/ogis | ogis@nara.gov | o: 202.741.5770 | f: 202.741.5769 | t: 877.684.6448

December 10, 2019--Sent via U.S. mail

Mr. Harry Persaud
Register No. 60376-060
FCI Loretto
P.O. Box 1000
Cresson, PA 16630

Dear Mr. Persaud:

This responds to your request for assistance from the Office of Government Information Services (OGIS), which we received on November 22, 2019 via U.S. mail. OGIS is the Federal Freedom of Information Act (FOIA) Ombudsman; in this role, we complement existing practice and procedure by assisting with the FOIA process. We provide information to FOIA requesters and Federal agencies to increase understanding and resolve disputes. However, OGIS has no investigatory or enforcement power, nor can we compel an agency to release documents. Using OGIS services does not affect your right to pursue litigation.

We carefully reviewed your submission of information and we understand that the Federal Bureau of Investigation (FBI) withheld the records you requested pursuant to FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A). This exemption protects law enforcement records pertaining to a pending or prospective law enforcement investigation or proceeding when release of information "could reasonably be expected to interfere" with that investigation or enforcement proceeding. Courts have recognized the specific harm of disclosing law enforcement records, including the premature release of witness statements and potential documentary evidence in pending criminal cases, civil cases or in administrative enforcement proceedings.

Courts have ruled that Exemption 7(A) remains applicable throughout long-term law enforcement investigations. However, Exemption 7(A) is "temporal" in nature; it is not intended to endlessly protect material simply because it is in an investigatory file. For this reason, you may wish to file a new request for the records you seek in a few months. Please be aware that once Exemption 7(A)'s protections are lifted, the agency may still apply other exemptions to protect the records.

We hope that this information is useful in understanding the FBI's response to your request. At this time, it appears that there is no further assistance OGIS can offer. If you have questions or concerns that we have not addressed, please contact us again. Thank you for bringing this matter to OGIS. We will close your case.

Sincerely,

The OGIS Staff

--
OFFICE OF GOVERNMENT INFORMATION SERVICES
National Archives and Records Administration
8601 Adelphi Road (OGIS)

College Park, MD 20740-6001
Email: ogis@nara.gov
Phone: 202-741-5770
Fax: 202-741-5769
Website: archives.gov/ogis
Blog: http://foia.blogs.archives.gov/

EXHIBIT 48

HAROLD PERSAUD
60376-060
FCI LORETTO, Po Box 1000
CRESSON, PA 16630
12/17/19

OGIS,
NATIONAL ARCHIVES
8601 ADELPHI ROAD,
COLLEGE PARK, MD 20740.

DEAR SIR,

I HAVE RECEIVED YOUR REPLY DATED 12/10/19 IN RESPONSE TO MY LETTER OF LATTER NOVEMBER.

YOU HAVE CORRECTLY IDENTIFIED THAT THE FBI IS MALICIOUSLY WITHHOLDING INFORMATION, WHICH IS MY RIGHT TO OBTAIN, UNDER FOIA RULES.

THIS INFORMATION IS ESCULPTORY TO MY CASE AND IS THEREFORE NECESSARY FOR MY APPEAL. I CAN DEMONSTRATE THAT THE FBI PRESENTED FALSE INFORMATION TO THE GRAND JURY. THE CRIME, OF WHICH I AM NOT GUILTY, DOES NOT INVOLVE VIOLENCE, GUNS, DRUGS OR ANY PHYSICAL HARM TO ANYONE. I AM BEING WRONGFULLY IMPRISONED.

I PLEAD WITH YOU, THEREFORE, TO PLEASE CONTINUE TO TRY AND OBTAIN MY RECORDS FROM THE FBI, SO I CAN PURSUE MY AMERICAN RIGHT TO FREEDOM.

SINCERELY,

H. Persaud

EXHIBIT 11

two-year PCI NSTs are justified regardless of the date of a patient's last

NST.

These and other AUC-based justifications for the challenged NSTs are

summarized in the following chart:

| Patient | Date of NST | AUC Indication | Record Ref. | Remarks |
|---------|-------------|----------------|-------------|---------|
| CB | 1/19/2010 | CABG >5 years | R.187, Page#ID 4069 | If a patient had CABG more than 5 years before, imaging is appropriate with symptoms (and is "uncertain" without), regardless of the date of the last test. (Ex. Sentencing 4, Suppl. App'x 2875, Indications ##55 and 58.) Prior CABG supersedes prior imaging when determining appropriateness for imaging, as demonstrated by the AUC's hierarchy for appropriate imaging. Thus yearly testing is appropriate. (*Id.* at 2882.) |
| CB | 3/8/2011 | CABG >5 years | R.187, Page#ID 4069 | *Id.* |
| MG | 8/10/2010 | CABG >5 years | Ex.RWB 2, App'x 1851 | *Id.* |

_EXHIBIT 11_

| MG | 1/4/2011 | CABG >5 years | Ex.RWB 2, App'x 1851 | Id. |
|----|----------|---------------|----------------------|-----|
| MG | 1/4/2012 | CABG >5 years | Ex.RWB 2, App'x 1851 | _Id._ |
| GG | 11/23/2010 | PCI >2 years | R.192, PageID# 5568 | If a patient had PCI more than 2 years before, imaging is appropriate with symptoms (and is "uncertain" without), regardless of the date of the last test. (Ex. Sentencing 4, Suppl. App'x 2875, Indications ##55 and 66). Prior PCI supersedes prior imaging when determining appropriateness for imaging, as demonstrated by the AUC's hierarchy for patients who may be classified into more than one of the clinical condition tables. Thus yearly testing is justified. (_Id._ at 2882.) |
| GG | 02/15/2012 | PCI >2 years | R.192, PageID# 5568 | _Id._ |

EXHIBIT 11

| | | | | |
|---|---|---|---|---|
| SH | 1/19/2010 | No records | Ex.RWB 3, Gov. App'x G085 | Biederman never actually finds SH's 2010 NST unnecessary, because a large section of SH's medical record, including the records from 2010, was missing from the file. He states that "nothing in the chart would suggest that she had [symptoms]," but admits that this is only because he literally had no patient records to review. (R.193, Tr., PageID#5818-19.) |
| SH | 3/15/2011 | Symptoms post-PCI | R.193 PageID# 5820 | In patients with new or worsening symptoms who have ever had a PCI, nuclear testing is appropriate regardless of when the last study was done. (Ex. Sentencing 4, Suppl. App'x 2875: Table 6, Indication #55). Prior PCI supersedes prior imaging when determining appropriateness for imaging, as demonstrated by the AUC's hierarchy for patients who may be classified into more than one of the clinical condition tables. (*Id.* at 2882.) |
| JR | 2/22/2011 | CABG >5 years | Ex.RWB 2, App'x 1853 | Same rationale as CB 2010. |

_EXHIBIT 11_

| | | | | |
|---|---|---|---|---|
| RMR | 9/10/2007 | Ordered by therapist | Ex.RR2, Suppl. App'x 2786, 2841 | Dr. Persaud performed this NST at the request of RMR's cardiac rehabilitation therapist. The therapist needed and requested an NST. As RMR was a new, emergent patient for Dr. Persaud, there was no NST on record. (Ex.RR4, Suppl. App'x 2865.) |
| RMR | 10/20/2009 | PCI >2 years | Ex.RR 4, Suppl. App'x 2865 | Same rationale as GG 2010. |
| MR | 04/16/2012 | CABG >5 years | R.193, PageID# 6198 | Same rationale as CB 2010. |
| DS | 08/24/2010 | PCI >2 years | R.181, PageID# 2794 | Same rationale as GG 2010. |
| JS | 03/09/2010 | NST >2 years | Ex.JS 2, App'x 1237-1266 | If the last nuclear study was conducted more than 2 years ago and was either abnormal _or_ the patient is at intermediate or greater CHD risk, nuclear stress testing is "uncertain." (Ex. Sentencing 4, Suppl. App'x 2873: Indications #26 and 28.) |
| RE | 2/8/2011 | PCI >2 years | Ex.RR 4, Suppl. App'x 2865 | Same rationale as GG 2010. |

_EXHIBIT 11_

| RE | 2/15/2012 | PCI >2 years | _Id._ | Same rationale as GG 2010. |
|----|-----------|--------------|-------|----------------------------|
| KS | 6/27/12 | High-risk CHD | R.191 PageID# 5333, 5357-58 | If a patient is asymptomatic but at high risk for coronary heart disease (CHD), nuclear testing is rated appropriate. (Ex. Sentencing 4, Suppl. App'x 2873: Indication #15). KS had multiple, acknowledged, high-risk factors for CHD, including high blood pressure and edema, a sign of congestive heart failure. |

For the two NSTs (RE on 1/5/10 and JS on 12/14/11) that do not fit neatly into one or more AUC categories, Dr. Persaud used his clinical judgment and familiarity with these patients' histories and symptomatology in determining that an NST was warranted. Even if Biederman disagrees, Dr. Persaud still more than satisfies Biederman's "80%-compliance" standard. (R.193, Tr., PageID#5763-64.)

That the remaining NSTs were justified, however, is not even debatable. What is troubling is that Biederman, despite professing expertise on the AUC, appears to have been either (1) unfamiliar with the "post-five-year rule" and the other rules that unequivocally apply here, or (2) insufficiently familiar with particular patients' circumstances to be able to

EXHIBIT 12

# *Harry Persaud M.D. FACC*

## CARDIOLOGY

29099 Health Campus Drive
Building 3 · Suite #110
Westlake, Ohio 44145
(440) 835-6169

*June 4, 2012*

*To The Independent Reviewer*

*Dear Sir,*

*Enclosed is a small synopsis of each patient whose intervention is to be reviewed. Only the index hospitalization is commented upon including a short history, reason for testing and reason why IVUS was deployed.*

*In reviewing each case with my attorney, we were concerned about the amount of information missing on each patient probably, we feel, due to poor recording, technical inefficiency, equipment malfunction, inadequate retrieval, etc.*

*These are not my fault and may be the reason that my accuser is questioning my ability to perform IVUS. Additionally, the exact point of stent deployment may be missing in some patients.*

*Also included are the nuclear scan pictures for most, though not all patients. Please return these as soon as possible since they are the originals for my patients chart.*

*Thank You,*

*Harry Persaud, M.D.*

*HP/ls*

LETTER I SENT TO REVIEWER WHO WAS CONFIDENTIAL.
LATER, I FOUND OUT IT WAS BARRY GEORGE.



GOVERNMENT
EXHIBIT
218

EXHIBIT 13

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

HARRY PERSAUD, M.D.     )  CASE NO.:
23225 Wingedfoot Drive     )
Westlake, Ohio 44145     )
     )  JUDGE:
     )
     Plaintiff,     )
     )
     )  **COMPLAINT FOR MONEY DAMAGES**
     vs.     )  *(Jury Demand Endorsed Hereon)*
     )
ST. JOHN MEDICAL CENTER     )
c/o Statutory Agent     )
Ryan Hooper, Esq.     )
29000 Center Ridge Road     )
Westlake, Ohio 44145     )
     )
and     )
     )
MICHAEL J. DOBROVICH, DO     )
29000 Center Ridge Road     )
Westlake, Ohio 44145     )
     )
-and-     )
     )
ABC Corporations 1 through 5     )
(Identity Currently Unknown)     )
     )
and     )
     )
JOHN DOE 1 through 5     )
(Identity Currently Unknown)     )
     )
     Defendants.

Now comes Plaintiff, Harry Persaud, M.D. ("Plaintiff"), by and through undersigned counsel, and for his Complaint against Defendants states as follows:

1

EXHIBIT 13

## THE PARTIES

1.     Harry Persaud, M.D. is a physician, licensed by the State of Ohio, who resides in Westlake, Ohio and at all times relevant herein, had privileges at St. John Medical Center as well as two other area hospitals.  Dr. Persaud is a Board Certified Cardiologist who specializes in interventional cardiology.

2.     St. John Medical Center is a hospital located within Cuyahoga County and operated as a 50/50 partnership by Sisters Charity Health System and University Hospitals ("UH").  St. John Medical Center was a hospital that had extended privileges to Plaintiff which included privileges to perform interventional cardiology within the Heart Catherization Lab located at St. John Medical Center.  St. John Medical Center did not employ Plaintiff, but provided staff and equipment necessary for the delivery of medical care in the Heart Catherization Laboratory.

3.     Michael J. Dobrovich, D.O. at all relevant times herein, was the Senior Vice President of Clinical Affairs and the Chief Medical Officer at St. John Medical Center.

4.     ABC Corporations 1 through 5 are, upon information and belief, corporations organized under the laws of the State of Ohio and/or licensed to do business in the State of Ohio that participated in, directed or otherwise were responsible for some or all the events and acts described herein.  The identity of these corporate entities is not currently known and, in the exercise of reasonable efforts, could not be discerned prior to the filing this lawsuit.

5.     John Does 1 through 5, are individuals who, upon information or belief supplied false information, directed false information, disseminated false information or otherwise have responsibility and/or culpability for the dissemination of false information and the damages

EXHIBIT 13

sustained by Plaintiff. ~~The identity of these individuals is not currently known and, in the exercise of reasonable efforts, could not be discerned prior to the filing this lawsuit.~~

## VENUE

6. Venue is proper in Cuyahoga County because the Defendants reside in and/or conduct business in the County of Cuyahoga and the acts which give rise to this cause of action occurred in Cuyahoga County.

## FACTUAL BACKGROUND

7. Plaintiff, Harry Persaud, M.D. ("Plaintiff") was licensed to practice medicine in the State of Ohio in 1987. Plaintiff was subsequently licensed to practice medicine in the state of California in 2003.

8. Upon being licensed in the state of Ohio, Plaintiff completed a two year fellowship in Cardiology at Cleveland Metropolitan General Hospital.

9. Commencing in 1989, Plaintiff established a private practice in Cardiology, with a focus on interventional cardiology, in Westlake Ohio.

10. In furtherance of his cardiology practice, Plaintiff applied for and was extended privileges at three hospitals: Fairview General Hospital, Southwest General Hospital and St. John Medical Center. Plaintiff enjoyed privileges at each of these institutions commencing in 1989.

11. Plaintiff's privileges at each of these institutions was unabated from 1989 until 2012 when Plaintiff voluntarily resigned his privileges at Fairview General Hospital for reasons unrelated to any of the issues in the claim.

12. From 1989 until approximately May 2012, plaintiff regularly practiced interventional cardiology including but not limited to cardiac stenting.

EXHIBIT 1.3

13.   From 1989 until the events described below, Plaintiff had never received any discipline or sanction for the Ohio State Medical Board; never received and discipline or sanction from any of the hospitals where he enjoyed privileges; and, never was named in any claim of medical negligence or malpractice arising out of his care and treatment.

14.   In February 2012, Plaintiff requested that another cardiologist with privileges at St. John Medical Center cover his patients while he was out of town.

15.   Upon his return, Plaintiff met with one of his patients who advised him that the physician covering for him had disagreed with a recommendation for surgical consult and instead referred the patient to University Hospitals for a cardiology consult.

16.   Thereafter, Plaintiff learned that St. John Medical Center was reviewing other patient files of the Plaintiff, though Plaintiff did not understand the purpose or reason for the review.

17.   In May 2012, Plaintiff was notified that his privileges had been suspended at St. John pending further investigation of his medical care.

18.   Following notification of the suspension, despite not knowing the specific reasons for the suspension, Plaintiff undertook to gather information relating to his care and treatment of the patients that appeared to be the subject of the inquiry.

19.   To this end, Plaintiff attempted to retrieve images from the Intravascular Ultrasound (IVUS), a diagnostic tool used to assess the blockage of a coronary artery.

20.   The IVUS may be used to create still images of a cross section of the cardiac artery as well as video of the coronary artery reflecting the blockage.

21.   Plaintiff routinely uses the IVUS imaging as one of several diagnostic tools to assess the extent of blockage and the need for more aggressive therapy such as stenting.

EXHIBIT 13

22.     When plaintiff attempted to retrieve the IVUS images, he learned that the equipment owned by St. John Medical center and operated by St. John Medical Center employees had not been functioning properly. The stored and preserved IVUS images did not, in many cases, accurately reflect the occlusion or blockage seen at the time of the heart catherization.

23.     Rather, many of the images were of different portions of the procedure and did not accurately reflect the patient's blockage.

24.     Accordingly, Plaintiff advised St. John Medical Center of the deficiencies in the images maintained by the IVUS at St. John Medical Center. Further, Plaintiff provided this information in a letter provided to an "independent" physician purportedly hired by St. John to review 30 patient files.

25.     The physician retained to provide an independent review was provided by St. John with a CD containing the intravascular ultrasound images of thirty patients treated by Plaintiff in the cardiac cath lab at St. John Medical Center.

26.     As it relates to these images, the "independent" physician noted that "Dr. Persaud may have a point in his letter regarding technical inefficiency, equipment malfunction or poor recordings."

27.     Despite recognizing that the images provided by St. John Medical Center were poor, the "independent" physician nevertheless expressed the position that the care provided by Dr. Persaud, stents in most cases, was medically unnecessary.

28.     This opinion was, on its face, inaccurate because the physician acknowledged that he could not read many of the IVUS images, and otherwise the images were of little value.

5

EXHIBIT 13.

29.     As of August 7, 2012 when the opinion was offered by this "independent" physician, St. John Medical Center knew that the deficiencies in their IVUS system and the images recorded made it impossible to assess the true nature of the occlusion or blockage seen by a cardiologist in the Cath Lab.

30.     On or about August 28, 2012, Defendant Michael Dobrovich sent letters to 23 patients of Plaintiff and advised these patients that "[i]t has recently come to our attention that you have undergone a placement of a coronary artery stent, that in our opinion, was unnecessary."

31.     This statement was false.   Likewise, St. John Medical Center and Michael Dobrovich could not have held a reasonable belief that the stents were medically unnecessary based upon the information at their disposal, including knowledge of the malfunction of their own equipment.

32.     The letter to each patient further offered to refer the patient to another Cardiologist affiliated with St. John Medical Center or a UH cardiologist at the Case Medical Center.  Thus, Defendants attempted to divert plaintiff's patients to other providers.

33.     Defendants' letter to Plaintiff's patients failed to disclose that the "independent" physician also had opined that "all the interventional procedures achieved excellent outcomes with coronary stenting."

34.     On or about August 30, 2012, St. John Medical Center contacted the Cleveland Plain Dealer and announced that they had sent letters to 23 patients purporting to be an apology for the placement of stents unnecessarily.

6